UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

---------------------------------------------- x

MAVERICK FUND, LTD.,
MAVERICK USA, L.P., MAVERICK
FUND II, LTD., MAVERICK LONG
FUND, LTD., MAVERICK LONG
ENHANCED FUND, LTD., and
SPRUGOS INVESTMENTS IX,
L.L.C.,

                  Plaintiff,

vs.

MOHAWK INDUSTRIES, INC.,
JEFFREY S. LORBERBAUM, FRANK
H. BOYKIN and BRIAN CARSON

                  Defendants.

---------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.  4:21-cv-118-TCB

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
AND STATE LAW

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION ........................................................... 2

II.   JURISDICTION AND VENUE ......................................................... 8

III.  THE PARTIES ................................................................................ 9

     A.    Plaintiffs ............................................................................ 9

     B.    Defendants ....................................................................... 11

IV.  PLAINTIFFS' INVESTIGATION AND USE OF CONFIDENTIAL
     WITNESSES ................................................................................ 15

V.   MOHAWK'S FRAUD .................................................................. 18

     A.    Mohawk's Business and Operations ................................ 18

     B.    The Advent of LVT Shakes Up the Industry .................... 19

     C.    Mohawk Reports "Record" Financial Results and Claims to
          Make "Superior" LVT .................................................... 21

     D.    Mohawk is Plagued by Defective LVT Production and
          Ballooning Inventories of Unsellable Product ................... 24

     E.    Overproduction and Refusal to Write Down Inventory of
          Defective LVT and Carpet Caused Mohawk's Financial Results
          to Be False and Misleading .............................................. 40

     F.    Defendants Pump Up Quarterly Earnings by Stuffing the
          Channel and the Saturday Scheme in Violation of SEC
          Guidance and GAAP Requirements.................................. 42

     G.    Mohawk's Fraudulent Scheme Proves to Be Unsustainable;
          Mohawk is Forced to Report That Its True Financial Condition
          is Not Nearly as Good as Defendants Previously Misled
          Plaintiffs to Believe ......................................................... 52

**Page**

H.    Continuing Revelations of Defendants' Wrongful Conduct ............... 57

VI.   RELIANCE ......................................................................................... 61

VII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................. 66

A.    Fourth Quarter and Full-Year 2016 ...................................... 68

B.    First Quarter 2017 ................................................................ 75

C.    Second Quarter 2017 ............................................................ 82

D.    Third Quarter 2017 ............................................................... 88

E.    Fourth Quarter and Full-Year 2017 ...................................... 96

F.    First Quarter 2018 .............................................................. 105

VIII. LOSS CAUSATION ......................................................................... 111

IX.   ADDITIONAL SCIENTER ALLEGATIONS ........................................ 114

A.    The Flooring North America Segment – Under the Direction of Defendant Carson – Orchestrated the Fraudulent Scheme ............... 115

B.    Mohawk Did Exactly What Defendants Said Mohawk Would Not Do ................................................................................. 116

C.    Problems at the U.S. LVT Plant Were Well Known to Executives Within Mohawk ................................................ 117

D.    A Senior Mohawk Employee Warned Defendant Carson of the Defective LVT in 2017 ....................................................... 117

E.    The Scale of the Defective LVT Problem was Massive and Obvious ............................................................................... 118

F.    Mohawk Created the G3 Team to Study Lagging LVT Sales .......... 118

**Page**

G.    Mohawk Installed Defective LVT at its Headquarters Where the Individual Defendants Worked ..........................................................119

H.    Major Customers, Including Home Depot, Told Mohawk Senior Executives its LVT was Defective .........................................119

I.    The Individual Defendants Were Focused on LVT Production .......120

J.    Lorberbaum Approved the Sale of Defective LVT For Pennies on the Dollar ........................................................................................121

K.    Inventory Reports Showed Mohawk's LVT Sales Were NOT Capacity Constrained, and that Mohawk's Over-Production of LVT and Carpet was Intended to Manipulate its Reported Financial Results ...............................................................................121

L.    Mohawk's Admissions of Material Weaknesses in Internal Controls and Financial Reporting in 2015 Required Defendants to Monitor Inventory Accounting Personally ....................................122

M.    Mohawk Adopted *and Studied* the Impact of New Accounting Provisions Concerning Revenue Recognition and Inventory During the Relevant Period ...............................................................123

N.    Mohawk Tracked Channel Stuffing and the Saturday Scheme in Reports Provided to Mohawk's Senior Executives...........................124

O.    Mohawk's Quarterly Sales Push was Driven Top-Down ................124

P.    Defendant Carson's Departure ........................................................125

X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................126

XI.    CAUSES OF ACTION ................................................................................127

XII.  PRAYER FOR RELIEF...............................................................................157

XIII.  JURY TRIAL DEMAND.............................................................................157

iii

Plaintiffs Maverick Fund, Ltd., Maverick USA, L.P., Maverick Fund II, Ltd., Maverick Long Fund, Ltd., Maverick Long Enhanced Fund, Ltd., and Sprugos Investments IX, L.L.C. (hereafter referred to collectively as "Maverick" or "Plaintiffs") make the following allegations based on the investigation conducted by Plaintiffs' counsel, including, but not limited to, a review and analysis of Mohawk Industries, Inc.'s ("Mohawk" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); media and securities analysts' reports about the Company; analyst conference calls; court filings in the action styled *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc. and Jeffrey S. Lorberbaum*, No. 4:20-cv-00005-ELR (N.D. Ga.) (the "Class Action"); discussions with percipient witnesses who previously worked for Mohawk, as detailed herein; consultations with experts; and the review and analysis of other matters of public record. While Plaintiffs' counsel has reviewed, and may reference or utilize these materials, Plaintiffs do not adopt any exculpatory language contained in these materials. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Moreover, as detailed further herein, Plaintiffs' counsel's investigation has been substantially

- 1 -

hampered by witnesses' refusal to speak on the matters alleged herein, as a result of both: (i) Defendants' efforts to "intimidate" at least one percipient witness to recant prior statements to investigators acting on behalf of the Class Action counsel, and (ii) investigations by the Department of Justice and the SEC, which resulted in at least one percipient witness hiring legal counsel who instructed the witness to not speak with Plaintiffs' counsel. Plaintiffs believe that additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.      SUMMARY OF THE ACTION

1.      Maverick purchased Mohawk common stock during the period from January 19, 2018 through the end of June 2018, at times when the prices of those shares were artificially inflated by Defendants' scheme as alleged herein.

2.      By 2015, and throughout the relevant period of Plaintiffs' investment in Mohawk, the flooring industry that Mohawk operated within was undergoing a substantial change. Luxury vinyl tile (commonly known as "LVT") was growing in popularity. Mohawk, one of the largest producers of flooring products in the world, was at risk of losing business if it could not adapt and grow its own LVT business.

3.      In 2015, Mohawk spent $1.2 billion on an LVT manufacturer with operations in the United States and Belgium. Though Defendants boasted Mohawk was capturing the U.S. LVT market with its "superior" LVT made in America, the truth was that over 50% of the LVT Mohawk manufactured in the United States at its LVT plant in Dalton, Georgia (the "U.S. LVT Plant") was defective and incapable of being sold. Mohawk was producing millions of square feet of defective LVT it could not sell, while other companies were capturing LVT market share.

4.      Indeed, according to former Mohawk employees, Mohawk's stockpile of defective LVT grew prior to and throughout the relevant period to the point where Mohawk had no space to store it all. In 2015, Mohawk had 36 million square feet of defective LVT inventory. By 2019, LVT inventory had grown to 90 million square feet.

5.      All the while, Defendants repeatedly reassured investors Mohawk was selling all of the LVT it could manufacture, and that Mohawk's LVT had a "superior design and performance" versus its competitors resulting in Mohawk's LVT "being well accepted across all channels of the market."

6.      Throughout the relevant period, as described in detail herein by Mohawk's former employees, Defendants concealed from investors that Mohawk's

U.S. LVT Plant was plagued by problems the Company could not fix, resulting in the production of LVT that could not be sold.

7.     Further, Mohawk improperly valued this defective LVT for accounting purposes. Mohawk stored the defective LVT in inventory, at full value as if the LVT was "first quality" and had no defects. Quite reasonably, accounting rules required Mohawk to write down the value of the defective LVT to its true value – virtually nothing. Yet, Defendants refused to write down this defective inventory for years.

8.     Defendants' refusal to write down the value of Mohawk's defective LVT caused Mohawk's inventory (an asset on its balance sheet) to grow, at the same time concealing the problems plaguing Mohawk's LVT production. Moreover, writing down the defective LVT would have negatively impacted earnings, so each quarter that the Company refused to take the required write down caused Mohawk to report inflated earnings that tricked investors as to Mohawk's true financial condition.

9.     In addition to Defendants' foregoing efforts to conceal Mohawk's inability to adapt to the advent of LVT and build a first quality product that could compete with that of Mohawk's competitors, by no later than 2016, Defendants

began manipulating Mohawk's publicly reported financial results. Defendants knew investors, including Plaintiffs, relied on Mohawk's publicly reported financial results to evaluate the value of Mohawk's publicly traded shares. This manipulation continued throughout the relevant period that Plaintiffs purchased Mohawk shares.

10.     Defendants manipulated Mohawk's public financial statements in several ways. In addition to refusing to write down inventory, as detailed above, Defendants also caused Mohawk to ship product to customers at the end of quarterly reporting periods – even if the customer did not want the product. Defendants did so for the sole purpose of meeting investors' and analysts' financial revenues and earnings estimates. Mohawk was pulling in future quarter sales to meet current quarter financial targets. This revenue recognition scheme not only violated clear accounting rules, but also violated Mohawk's own publicly stated accounting policies on revenue recognition. By inflating revenues in this manner, Mohawk's earnings were similarly impacted, and investors were misled as to the profitability of Mohawk's business and the true value of the Company's shares.

11.     Defendants also manipulated Mohawk's earnings and profit margins by producing flooring product (LVT and carpet) far in excess of customer demand. This over-production of product provided Mohawk the short-term benefit of

decreasing its production costs per unit, thus causing profit margins on a per unit basis to *appear* to be better than they actually were. Investors had been, as Defendants knew, focused on Mohawk's margins. Defendants' manipulation wasn't without significant cost to Mohawk. This excess product (both defective LVT and carpet) would have to be stored by the Company, at significant cost. Further, stored carpet became unusable when stored for extended periods of time. Defendants engaged in this excess production manipulation, not for a legitimate business purpose, but to deceive investors and Wall Street analysts about the true financial condition of the Company. This practice of over-production was bad for Mohawk's long-term business health, and contrary to what investors would want.

12.    In sum, Plaintiffs allege Defendants engaged in a years-long conspiracy to conceal and misrepresent the true financial condition of Mohawk's businesses, foreseeably causing investors (like Plaintiffs) to improperly assess the value of Mohawk's publicly traded common shares.

13.    Plaintiffs' allegations are based upon the accounts of percipient witnesses, former employees who personally witnessed Defendants' schemes to deceive investors. As one former employee acknowledged, he/she witnessed so

much "dishonest, shady dealing" at Mohawk that the Company had "***Enron scandal written all over it***."[1]

14.     Ultimately and foreseeably, Defendants' efforts to prop up Mohawk's stock price by hiding the Company's true financial condition, could not be maintained indefinitely. Defendants' scheme of robbing future quarter sales to meet analyst earnings estimates had caused Mohawk to dig a deeper and deeper hole for itself to get out of at the beginning of each quarter – until the hole became insurmountable.

15.     On July 25, 2018, Defendants revealed Mohawk's financial condition was not nearly as good as investors had been led to believe. Mohawk missed earnings by a mile. Mohawk had earned $3.51 per share versus the $3.90 that was estimated. The shock to investors caused Mohawk shares to sink from $217 to $179, a drop of over 18%.

16.     Upon learning Mohawk's second quarter 2018 financial results, Maverick began selling its entire position of Mohawk shares. As a result of

---

[1] Throughout this complaint, all emphasis is added unless otherwise noted.

Defendants' misleading statements and the subsequent decline in Mohawk's stock price, Plaintiffs suffered substantial economic losses.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1337, and 1367.

18.    The Court has personal jurisdiction over Defendants, as all Defendants are residents of the United States and/or have minimum contacts with this District.

19.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d).

20.    Defendants transact business in this District. Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District.

21.    In connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the national securities markets.

## III.   THE PARTIES

### A.   Plaintiffs

22.    Non-party Maverick Capital, Ltd. is a registered investment manager managing private investment funds exclusively for qualified investors. The firm was founded in 1993 by, among others, Lee S. Ainslie III.  Maverick Capital, Ltd. has offices in Dallas, Texas and New York, New York.  Maverick Capital, Ltd. is the investment manager on behalf of Plaintiffs.

23.    Plaintiffs Maverick Fund, Ltd., Maverick USA, L.P., Maverick Fund II, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd., are private investment funds managed by non-party Maverick Capital, Ltd. The claims brought by Maverick Fund, Ltd. were assigned to it by Maverick Fund, L.D.C. The claims brought by Maverick USA, L.P. were assigned to it by Maverick Fund USA, Ltd. References to "Plaintiffs" or "Maverick" or the "Maverick Plaintiffs" during the relevant period of these investments include the assignors Maverick Fund, L.D.C. and Maverick Fund USA, Ltd. Maverick Capital, Ltd. acted as the money manager for the Maverick Plaintiffs at all relevant times and had total investment discretion for the Maverick Plaintiffs' investments.

24.    Plaintiff Sprugos Investments IX, L.L.C. ("Sprugos"), is an investment entity. Sprugos maintained a separately managed account with Maverick Capital, Ltd. Maverick Capital, Ltd. acted as the investment manager on behalf of Plaintiff Sprugos, and executed full discretion to make all investment decisions on behalf of Sprugos as it concerned Mohawk. Maverick Capital, Ltd. purchased and sold Mohawk common stock on behalf of Plaintiff Sprugos at times consistent with the other named Plaintiff investment funds managed by Maverick Capital, Ltd. Howard Hughes Medical Institute is the sole member and manager of Sprugos. References to "Maverick" or "Plaintiffs" herein include Plaintiff Sprugos, unless otherwise stated.

25.    Plaintiffs and Maverick Capital, Ltd., as the investment manager for Plaintiffs, read and relied upon Defendants' false and misleading statements alleged herein, as set forth in greater detail below. In reliance on Defendants' material misrepresentations and omissions, as described below, Plaintiffs purchased Mohawk common stock and suffered substantial losses caused by Defendants' wrongful conduct.

26.    Plaintiffs purchased approximately 1.4 million Mohawk common shares during the period beginning on or about January 19, 2018 through the end of

June 2018, while Mohawk stock traded at artificially inflated prices. Plaintiffs held nearly all of these Mohawk shares through disclosures on July 26, 2018, which disclosures revealed Mohawk's true financial condition that had been concealed by Defendants' fraudulent scheme and which foreseeably caused Mohawk's stock price to decline to the detriment of Plaintiffs. After the disclosures on July 26, 2018, Plaintiffs sold down their entire position of Mohawk stock. Plaintiffs' purchases and sales of Mohawk stock are set forth in Plaintiffs' trade data provided to Defendants by e-mail dated June 18, 2021. Plaintiffs' trade data is incorporated by reference herein, which Plaintiffs will submit to the Court under seal upon request.

## B.    Defendants

27.    Defendant Mohawk is a manufacturer of floor covering products, including carpet, rugs, hardwood flooring, laminates, sheet laminates, tile, and ceramic. Mohawk sells its flooring products to distributors, wholesalers, and retailers, including big-box stores like Sherwin Williams and Floor & Décor. Mohawk's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MHK."

28.    Defendant Jeffrey S. Lorberbaum ("Lorberbaum") is Mohawk's Chief Executive Officer, a position he has held since January 2001. Lorberbaum is also

the Chairman of Mohawk's Board of Directors, a position he has held since May 2004. Defendant Lorberbaum signed and certified the purported accuracy of Mohawk's quarterly and annual SEC filings throughout the relevant period. Further, throughout the period in which Plaintiffs researched their investment in Mohawk, Lorberbaum regularly spoke to investors and securities analysts regarding Mohawk, the Company's products, and its financial results.

29.    Defendant Frank H. Boykin ("Boykin") was Mohawk's Chief Financial Officer from January 2005 through April 2019. Defendant Boykin signed and certified the purported accuracy of Mohawk's quarterly and annual SEC filings throughout the relevant period. Further, throughout the period in which Plaintiffs researched their investment in Mohawk, Boykin regularly spoke to investors and securities analysts regarding Mohawk, the Company's products, and its financial results.

30.    Defendant Brian Carson ("Carson") was Mohawk's President of Flooring North America from July 2011 until he was fired on November 12, 2018. As Carson has publicly stated, including on his personal LinkedIn profile, he had "Full P&L [profit and loss] ownership" over Mohawk's entire North American business in his role as President of Flooring North America. He oversaw all of

Mohawk's 42 plants and 41 distribution centers in North America. Carson managed the Flooring North America segment of Mohawk (Mohawk's largest division) and was a member of Mohawk's world-wide leadership team. Mohawk described Carson in its public filings with the SEC as "an 'executive employee' and a 'key employee,' as those terms are defined in O.C.G.A. 13-8-51," and that he "managed the Flooring North America Business Unit of Mohawk, while also participating on Mohawk's world-wide leadership team." Carson personally orchestrated and caused the Flooring North America segment of Mohawk to (i) not disclose problems with the Company's production of LVT, ii) manipulate its inventory levels by producing and holding excess and defective LVT and carpeting, without writing down the value of that LVT and carpet as required, and (iii) to pull into the present quarter sales that otherwise were scheduled for future periods, including through the Saturday Scheme (as defined *infra* at ¶117). Defendant Carson, as the President of the North America Flooring segment, was responsible for and did in fact furnish false and misleading information to the Company concerning the North America Flooring segment for inclusion in public press releases, SEC filings, analyst conference calls and other disclosures to investors, which information was reported

to investors (including Plaintiffs) and, foreseeably, relied upon by those investors in making investment decisions to their detriment.

31.     Defendants Lorberbaum, Boykin, and Carson are, at times, referred to herein collectively as the Individual Defendants.

32.     During the relevant period, the Individual Defendants and other Mohawk senior executive officers were privy to material adverse non-public information concerning Mohawk. Given their positions at Mohawk, the Individual Defendants and other Mohawk senior executive officers had access to non-public information about Mohawk's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them. Given their possession of such information, the Individual Defendants and other Mohawk senior executive officers knew or recklessly disregarded that the adverse facts alleged here had been misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

## IV.   PLAINTIFFS' INVESTIGATION AND USE OF CONFIDENTIAL WITNESSES

33.    Plaintiffs, through their counsel, have conducted an inquiry reasonable under the circumstances. Plaintiffs' allegations are based upon information and belief, such that Plaintiffs believe additional evidentiary support will be forthcoming in discovery.

34.    Plaintiffs' counsel's investigation included speaking with many former employees of Mohawk. Those percipient witnesses alleged herein, and which Plaintiffs' counsel's investigator interviewed as part of Plaintiffs' counsel's investigation, are denoted as Confidential Witness or ("CW"), and a number, such as CW1 or CW2.

35.    On June 29, 2020, Lead Plaintiff in the Class Action filed its Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Class Action Consolidated Complaint"). Plaintiffs' counsel reviewed the Class Action Consolidated Complaint, which corroborates Plaintiffs' counsel's investigation and its findings.

36.    Certain witnesses/former employees have refused to speak to Plaintiffs' counsel's investigator at this time, absent formal discovery. This includes witnesses/former employees identified in the Class Action Consolidated Complaint.

37.     On information and belief, Plaintiffs' counsel believes it has been impeded in its investigation by two factors beyond Plaintiffs' control: (i) counsel for Mohawk has pressured witnesses not to cooperate with any investigation; and (ii) the U.S. Attorney's Office for the Northern District of Georgia and the SEC have begun investigating Mohawk, interviewing former employees of the Company, and causing employees to be concerned about criminal liability.

38.     A former Mohawk employee, identified as FE8 in the Class Action Consolidated Complaint, informed Plaintiffs' counsel's investigator that Mohawk's attorneys contacted FE8 and "basically tried to intimidate" FE8 to recant his statements to Class Counsel about the Defendants' fraud. FE8 said: "***Mohawk hired the big guns here in Atlanta to intimidate or try to intimidate [me]***."

39.     In addition, some witnesses likely have been reluctant to cooperate in Plaintiffs' pre-suit investigation because of the ongoing criminal and civil investigations of Mohawk.

40.     Shortly after the Class Action Consolidated Complaint was filed on June 29, 2020, Mohawk revealed it was the subject of a DOJ and SEC investigation. On July 13, 2020, Mohawk filed a Form 8-K with the SEC disclosing that the

Company had received subpoenas from the DOJ and the SEC concerning the issues

raised by this action. The Form 8-K stated:

> On June 29, 2020, an Amended Class Action Complaint for violations of
> federal securities laws was filed against Mohawk and its CEO Jeff
> Lorberbaum in the Northern District of Georgia. The complaint alleges that
> the Company (1) engaged in fabricating revenues by attempting delivery to
> customers that were closed and recognizing these attempts as sales; (2)
> overproduced product to report higher operating margins and maintained
> significant inventory that was not salable; and (3) valued certain inventory
> improperly or improperly delivered inventory with knowledge that it was
> defective and customers would return it. The Company intends to vigorously
> defend itself in the lawsuit.

> On June 25, 2020, the company received subpoenas issued by the U.S.
> Attorney's Office for the Northern District of Georgia and the U.S. Securities
> and Exchange Commission *on topics similar to those raised by the amended
> complaint*. The company is cooperating with those authorities.

41.    Recent Mohawk SEC filings indicate the U.S. Attorney's Office and

SEC investigations "are ongoing."

42.    As a result of the government investigations, at least one

witness/former employee identified in the Class Action Consolidated Complaint

has been unwilling to speak to Plaintiffs' counsel's investigator at this time, absent

formal discovery.

43.    FE11 from the Class Action Consolidated Complaint informed

Plaintiffs' counsel's investigator he communicated with the Class Action Lead

Counsel's investigators, and investigators with the DOJ/FBI, about these matters. In light of being contacted by the DOJ/FBI, FE11 declined to speak further with Plaintiffs' counsel's investigator about Mohawk.

44.    As a result of witnesses' reluctance to cooperate in Plaintiffs' investigation, certain information about the Defendants' fraud – including information alleged in the Class Action Consolidated Complaint – may be too difficult or impossible to acquire absent formal discovery.

45.    In light of Plaintiffs' counsel's communication with FE11, and the basis for the unwillingness of the witness to speak about Mohawk, certain allegations attributable to FE11 are repeated from the Class Action Consolidated Complaint. Allegations attributable to FE11 are clearly marked as such. Allegations attributable to FE11 are corroborated by Plaintiffs' counsel's investigation, and Plaintiffs' counsel has a good faith basis to believe such allegations were well-pleaded in the Class Action Consolidated Complaint.

## V.    MOHAWK'S FRAUD

### A.    Mohawk's Business and Operations

46.    Mohawk is the world's largest manufacturer of flooring products, historically dominating the industry in developing and distributing conventional

flooring products like wood, stone, tile, ceramics, laminate, and carpet ("Conventional Flooring Products").

47. The United States is Mohawk's largest market. In 2017-2019, the Company reported annual worldwide net sales ranging between $9.5 billion to $10 billion. Approximately 42% of sales were attributable to the Flooring North America segment, which includes Conventional Flooring Products and all LVT sold in the United States.

48. Mohawk markets and distributes its product lines to independent distributors, floor covering retailers, home centers, mass merchandisers, department stores, e-commerce retailers, shop at home, buying groups, commercial contractors and commercial end users. Some products are also marketed through private labeling programs.

49. At all relevant times, according to its SEC filings, Mohawk distributed products to its customers from its distribution centers predominately on Mohawk-operated trucks.

**B.    The Advent of LVT Shakes Up the Industry**

50. Leading up to the relevant time period, Mohawk's business was doing well and growing both revenues and earnings. By the end of 2016, the Company's

revenues rose to "an all-time high" of $9 billion for the year, with the Company boasting of "adjusted operating income of $1.3 billion, up 24% over the prior year, the highest in our history."

51.     Mohawk was reporting record sales and earnings growth and exceeding investors' expectations quarter after quarter. The Company's stock price soared commensurately, rising from just over $100 per share at the beginning of 2013 to over $230 per share at the start of the relevant period in early 2017.

52.     In early 2017, Defendants told the market to expect Mohawk's growth to continue. On Mohawk's earnings call at the start of 2017, for example, Lorberbaum boasted: "Today Mohawk is in the best position in the Company's history." Lorberbaum similarly told investors: "Excluding acquisitions and intellectual property, our 2017 sales will grow similarly to last year."

53.     However, during this period, LVT was growing in popularity and replacing Mohawk's sales of Conventional Flooring Products. For example, in January 2015, Mohawk told investors in a press release: "In the U.S., LVT now represents about 5% of the total flooring market, and sales are projected to grow *more than 15% annually* through the end of the decade." The increasing popularity of LVT posed a growing risk to Mohawk's apparent success and dominance in

Conventional Flooring Projects. Demand for LVT was increasing dramatically. Mohawk was trying to adapt. Mohawk's competitors, including Shaw and Armstrong, established reliable and cost-effective LVT manufacturing sources from international suppliers.

54.    In 2015, Mohawk spent $1.2 billion to purchase IVC Group ("IVC"), an LVT manufacturer with an LVT plant in Belgium and another LVT plant in the United States. Defendant Lorberbaum boasted that "[IVC's] new LVT plant in Dalton, Ga. will be one of the world's largest, most efficient production lines with leading technology and will position us to meet the rapidly growing U.S. market."

55.    Despite spending over a billion dollars to acquire an LVT manufacturer, in 2016 and 2017 Mohawk was struggling to win LVT market share, while, at the same time, LVT continued to displace Conventional Flooring Projects in which Mohawk was dominant.

**C.    Mohawk Reports "Record" Financial Results and Claims
to Make "Superior" LVT**

56.    Throughout the relevant period, Defendants misleadingly manipulated Mohawk's financial results while at the same time representing to investors the Company was consistently growing revenues and earnings – not by engaging in

short-term financial manipulations – but by focusing on the long-term benefit of the Company. Nothing could be further from the truth.

57.     While Defendants' misleading statements are detailed more fully herein at § VII, the below small sampling of statements provide context.

58.     In February 2017, Mohawk reported "an outstanding performance" with adjusted operating earnings and revenues "the highest in our history." Ironically, despite Defendants' manipulation of Mohawk's financial results, Defendants assured investors the Company had achieved these record financial results by focusing on the long-term: "***While some public companies focus on meeting quarterly expectations or maximizing results in a given year, we focus on building a company that will last forever***."

59.     The Company continued to report record financial results throughout 2017. On April 27, 2017, Mohawk issued a press release boasting "sales and earnings per share [that] set records for the first quarter." On July 27, 2017, Mohawk again issued a press release boasting "Mohawk delivered record results, generating the highest sales, adjusted operating income and adjusted EPS in the company's history." And, on October 26, 2017, Mohawk once again reported to investors it had "delivered record adjusted earnings and EPS."

60.     Defendants were similarly assuring investors that Mohawk was well-situated for the future of flooring – and would capture significant market share as LVT grew in popularity. Defendants told investors of Mohawk's LVT products: "**With their superior design and performance, our flexible, rigid and commercial LVT collections are being well accepted across all channels of the market.**" According to Defendants, Mohawk was "in the best position by having the lowest cost and largest capacity in the U.S." to meet the growing LVT market.

61.     By February 2018, at which time Plaintiffs were already purchasing Mohawk shares, Defendants were boasting: "We began 2017 with Mohawk in the best position in its history and concluded the year even stronger."

62.     Little did Plaintiffs know that behind Defendants' repeated statements of "record" financial results, "superior" LVT, and a purported dedication to long-term thinking, was a Company manipulating its financial results to meet analysts' quarterly earnings estimates, borrowing sales from future periods to make quarterly estimates, unable to produce marketable LVT, refusing to write-down defective and unsellable inventory, and otherwise hiding the Company's problems and true financial condition – as set forth below.

**D.      Mohawk is Plagued by Defective LVT Production and Ballooning Inventories of Unsellable Product**

63.     According to CW1, a VP on National Accounts and VP of E-Commerce at Mohawk from March 2014 through October 2019, within Mohawk it was widely known that the Company's U.S. LVT flooring production was defective.[2] According to CW1: "We could not make a first quality product."

64.     The defective LVT caused significant problems with Mohawk's customers, including Home Depot. CW1 participated in quarterly business review meetings with Home Depot from 2017-2019 at Mohawk's offices, during which LVT issues were a key point of contention. Home Depot representatives at the meetings were frustrated that Mohawk couldn't fulfill LVT flooring orders and that frequent promises to improve Mohawk's LVT product were broken. CW1 said the faulty product Mohawk produced was the "elephant in the room" at these meetings, because both Home Depot and Mohawk leadership knew that Mohawk was not able

---

[2] CW1 worked at Mohawk for 14 years from 2006 until 2020. CW1 left Mohawk holding the title of VP of National Sales. CW1 participated in quarterly meetings with Home Depot, a major Mohawk customer, throughout the relevant period. During these meetings, LVT defects and production were a significant issue of discussion. CW1 also served on an internal committee (the "G3 Team") tasked with analyzing why Mohawk's LVT sales were lagging.

to make high quality LVT. Mohawk's general counsel, Chris Rosselli, and Senior Vice President over distribution, Paul Murfin, were both present in these meetings.

65.     Furthermore, Mohawk's senior executives were privy to the LVT defects in a most profound way. According to CW1, ***Mohawk's own corporate headquarters installed Mohawk LVT that wouldn't lay flat and all peeled back up***.

66.     CW1 also worked on a "G3 Team" that met weekly and was tasked with analyzing why LVT sales were lagging. Among other things, CW1 learned from a quality engineer on the team that Mohawk purposely shipped defective LVT product ***the Company knew would be sent back*** just so Mohawk could invoice for it. The was done so Mohawk could "get their billing numbers up." This was unsurprising to CW1, as CW1 had worked for Mohawk long enough to know the Company had a pattern of "shady behavior."

67.     According to CW2, by mid-2017 Mohawk had millions of square feet of defective LVT flooring and the Company was slashing prices on the LVT to sell it – without disclosing the defects to purchasers. CW2, a sales representative for Mohawk from April 1998 to February 2018, personally sold hundreds of thousands of square feet of the defective LVT in 2017 – marked down from $2.50 per square

foot to just $0.99 per square foot. According to CW2, the LVT he was tasked with selling had an issue with the locking mechanism that kept the pieces together upon installation. The quality of the product was terrible. After installation, according to CW2, the LVT came apart. However, it would be a long time before purchasers of the LVT would discover this, as the defect was not obvious until installation. In 2017, when he was selling the defective LVT, CW2's supervisor told CW2 there was an issue with the locking mechanism but instructed CW2 to describe the product as first quality to customers. According to CW2, describing the product as first quality was nefarious and "dishonest, shady dealings." After a twenty-year career at Mohawk, CW2 quit in February 2018.

68.     According to CW2, Defendant Lorberbaum knew in 2017 about Mohawk's significant defective LVT problem. As CW2 told Plaintiffs' counsel's investigator, "he [Defendant Lorberbaum] knew it was defective." According to CW2, Lorberbaum knew that Mohawk was selling one million square feet of LVT at a substantial discount for only $0.99 per square foot, versus the standard price of $2.50 per square foot. First rate LVT for only $0.99 per square foot was an "unheard of deal." Based on 20 years at the Company, CW2 stated Mohawk "*has Enron scandal written all over it*."

69.    CW2's account of Mohawk selling defective LVT as "first rate" is corroborated by CW3. CW3 worked at Mohawk from 2004 until May 2018, serving as a VP of national accounts for Mohawk Industries from March 2018 to May 2018, and as a VP of independent distribution for Mohawk Industries from August 2016 to April 2018.[3] CW3 managed relationships with customers, and CW3 witnessed the deleterious impact the defective LVT had on Mohawk's business relationships with customers. According to CW3, ***half or more than half of the LVT Mohawk produced was unsalable and should have been scrapped***. Rather than scrap the defective LVT, Mohawk sold it to customers and represented the scrap-quality LVT was in fact "first quality." Customers who received the LVT were in many cases unhappy with the product and it hurt Mohawk's relationships with those customers. Indeed, according to CW3, Mohawk lost business with a broad cross-section of customers over the defective LVT.

70.    It was no secret within Mohawk why the Company was producing so much unsellable scrap LVT: Mohawk's domestic LVT production lines were

---

[3] CW3 became employed by Mohawk in 2004, and remained with the Company until May 2018. CW3 held numerous positions in that time, almost all of which involved managing customer relationships.

flawed from inception, unreliable, and not capable of consistently producing products to the desired specifications. FE11, Senior Vice President of Product Development at Mohawk from January 2017 to March 2019, explained that it was well known within the Company that the LVT production line was, as FE11 put it, "fatally screwed up."[4]

71.    FE11 explained that there were inherent flaws in Mohawk's domestic manufacturing process for LVT that persisted from the time he joined Mohawk in January 2017 to the time he left in March 2019. FE11 said that, when he first arrived at Mohawk, he was told that the Company had invested a substantial sum of money acquiring IVC and its U.S. LVT Plant. But as he explained, once FE11 saw the state

---

[4] FE11 was the Senior Vice President of Product Development at Mohawk from January 2017 to March 2019, primarily responsible for product development and management within the LVT and laminate space. Prior to working at Mohawk, FE11 worked for 14 years as a Director and Vice President of commercial hard surface business at a flooring manufacturer. FE11 was also authorized to speak on behalf of Mohawk and was quoted in articles published for the public in industry publications during the Class Period, including Floor Covering Weekly and Floor Trends Magazine. When Plaintiffs' counsel's investigator spoke with the witness believed to be FE11, FE11 informed the investigator that he had already spoken with Lead Counsel and with investigators from the DOJ and SEC. As a result, FE11 had obtained legal counsel and FE11's legal counsel instructed FE11 to refrain from answering any further questions regarding Mohawk.

of affairs at Mohawk's LVT manufacturing facilities, "I was aghast. I thought what am I getting myself into? This is a nightmare."

72.    FE11 explained that, from the time FE11 arrived in January 2017 until the time FE11 left in March 2019, Mohawk's U.S. LVT Plant's press had myriad problems, including gauge issues that caused inconsistency in the thickness of LVT produced. FE11 explained that the line also had issues that made it problematic to click the LVT pieces together; there would be visible height differences among LVT pieces that were supposed to be uniform in height.

73.    FE11 explained that in January 2017, shortly after he joined Mohawk, FE11 attended a Surfaces Trade Show with Carson and Senior Vice President over distribution, Paul Murfin. During the trade show, Carson stated to Murfin that he was getting reports from the field that "the dogs don't like the dog food we're making." FE11 explained to Carson that Mohawk was competing against products that were far superior to the products Mohawk was making, and that retailers and consumers preferred Mohawk's competitors' products.

74.    FE11 also reported that starting in January 2017, the production leadership in Dalton tried to convince Carson to supplement Mohawk's domestic production from sourced material because Mohawk did not have the equipment to

compete with the features of the LVT imported from China. FE11 explained, "the line was not good," and "[i]t wasn't capable of producing the type of product consumers were expecting."

75.     Having spent $1.2 billion to purchase IVC and the U.S. LVT Plant and having highly publicized that purchase to investors, the Individual Defendants were, of course, closely watching Mohawk's production from the U.S. LVT Plant, and concerned by the manufacturing deficiencies. In fact, FE11 noted, Lorberbaum changed FE11's boss – the person overseeing Mohawk's domestic LVT production – five times in FE11's two years with the Company.

76.     In March or April 2018, CW4, an Organization Learning Specialist and Manager of Organizational Development in the Human Resources Department at Mohawk, was assigned by CW4's bosses (Director of Talent Operations Becky Redd and Senior VP of Human Resources Rod Weidemeir) to examine the problems of production quality, low morale, and high employee turnover at the U.S.

LVT Plant.[5] By that time, according to CW4, the problems at the U.S. LVT Plant had been known to the Company for some time.

77.     According to CW4, the U.S. LVT Plant was producing defective product, and nobody knew how to fix the problem. Upper management knew about the defective LVT and put pressure on the employees at the U.S. LVT Plant to improve the quality of the product they manufactured. Machinery was constantly failing, computer systems were going down, and production quality couldn't meet expected standards. It all led to a human resources problem at the plant, which is where CW4 to become involved.

78.     According to CW4, low-level employees were expected to work overtime to deal with the issues at the U.S. LVT Plant. Low-level employees also complained of unsafe working conditions and unreasonable pressure from management. That pressure came from the facility's managers, but was passed

-----

[5] CW4 worked in Mohawk's corporate headquarters the Human Resources Department from December 2016 until December 2018. CW4 conducted trainings and assessments of lower-level employees, and was also responsible for improving relations between middle-management and their direct reports.

down on them from their bosses. As a result, low-level employees were leaving the factory *en masse* due to the toxic work environment.

79.   According to CW4, production problems at the U.S. LVT Plant caused the Company to be unable to fulfil tons of orders for LVT because the product it manufactured was defective. The amount of bad LVT inventory was "huge."

80.   CW4 visited Mohawk's Belgium LVT facility, which did not have the same manufacturing problems as the U.S. LVT Plant. CW4 attributed the success of the Belgium plant to the European employees being treated as craftsmen, while the U.S. LVT Plant failed, in part, because it had a different culture that regarded employees as cheap labor.

81.   According to CW5, the Chief Information Officer for Mohawk Industries' Flooring Division from April 2014 until August 2017, within Mohawk it was widely known that the Company's LVT production facility in Georgia (the U.S. LVT Plant) had widespread quality problems.[6] According to CW5: "There

_____

[6] CW5 was the Chief Information Officer for Mohawk Industries from April 2017 until August 2017. CW5 worked at the Company's headquarters, and reported to Defendant Brian Carson. In his role as Chief Information Officer, CW5 oversaw the information technology and information systems department for Mohawk. CW5 was a member of Mohawk's executive team, and was privy to weekly leadership

were issues with quality and there was a lot of pressure to fix it." Moreover, CW5 noted: "I know there was a lot of money thrown into the plant, but I don't think they got the quality up to where they needed it to be." CW5 knew this because the problems with the LVT were discussed in monthly business review meetings, which CW5 (along with other company leadership and executives) attended. In these business review meetings, all business units presented overall numbers and reports, including reports from the LVT plant that showed scrap numbers going up.

82.     CW6, a distribution manager/plant manager for Mohawk Industries at the Dalton Georgia distribution center from April 2014 to November 2019, supervised shipments of defective LVT nationally.[7] According to CW6, the production operations in Dalton, Georgia were producing massive volumes of LVT

_____

meetings that discussed, among other things, financials and the condition and the business.

[7] During the relevant period, CW6 reported to Jeremy Tatum, Director Logistics Operations, Distribution & Logistics - Inside Operations, who reported to VP Logistics & Distribution Dan Flowers. CW6 supervised over 100 employees at the Company's IVC facility at Dalton, Georgia, where workers prepared and loaded shipments of LVT and other products for delivery to customers nationwide. CW6 was identified as FE7 in the Consolidated Class Action Complaint. CW7 confirmed the allegations attributed to FE7 in the Consolidated Class Action Complaint are accurate.

flooring that was ultimately scrapped. There were numerous flaws with the LVT. As CW6 described it, the LVT manufactured in the U.S. had "massive defects." The LVT production problems were not hidden from management. As CW6 described it: "I wouldn't have considered it to be a big secret; they had a lot of second quality product that was sold and a lot that was scrapped." The scrapped LVT was so bad it had to be discarded and/or warehoused indefinitely.

83.     According to CW6, contrary to the Company's statements, Mohawk was not capacity constrained. Demand for LVT from purchasers did not outstrip Mohawk's ability to make LVT. Rather, from April 2017 onward, Mohawk always had plenty of (defective) LVT surplus stockpiled. Indeed, as part of CW6's responsibilities, for at least three years CW6 provided weekly LVT inventory reports to Tatum and Flowers (as well as Andrew Kearton) every Monday morning showing the excess LVT inventory.

84.     According to CW6, the LVT inventory grew throughout the relevant period until the point where Mohawk had no space to store it all. In 2015, Mohawk had 36 million square feet of LVT inventory. By 2019, LVT inventory had grown to 90 million square feet.

85.     CW6 described the surplus LVT storage situation as "insane." In 2017 and 2018, the GHB distribution center spent $5 million to outfit its space to accommodate the extra/defective LVT. Further, the Company filled at least 100 empty trailers with surplus/scrap LVT. In 2018, Mohawk had to empty the scrap LVT from the over 100 trailers into rented warehouse space.

86.     Mohawk rented warehouse space in Dalton off 11th Ave (approximately 150,000 to 200,000 square feet) and on Goodwill Drive (a little under 100,000 square feet) to store the defective LVT. Mohawk filled them with scrap LVT. The LVT was still stored in these facilities when CW6 left in 2019. CW6's boss (Tatum) was involved in addressing this problem, and personally visited the storage facilities with CW6. CW6 discussed this regularly with Tatum.

87.     Mohawk's LVT manufacturing problems persisted throughout 2018 and into 2019, resulting in Mohawk having to dump the defective profit at a steep discount. CW7, a Supply Chain Director from March 2019 until December 2019, was personally involved with selling Mohawk's sub-par LVT.[8] According to CW7,

---

[8] CW7 worked as a Supply Chain Director for Mohawk Industries from March 2019 until December 2019 at Mohawk's headquarters in Georgia.

Mohawk's U.S. LVT manufacturing center had produced "buildings and buildings" worth of sub-par product. And, in 2019, according to CW7, Mohawk was forced into "selling [the defective LVT] for pennies on the dollar by the truckload." CW7 recalls product that Mohawk should have normally sold for $2.00 per square foot being sold for $0.42 per square foot. CW7 was forced to sell the defective LVT to small retailers because, even though the product had been specifically manufactured for Home Depot and Lowe's, neither Home Depot nor Lowe's would take the defective LVT. Indeed, according to CW7, the defective LVT had to be removed from boxes labeled Home Depot and Lowe's before being delivered to the small retailers, which substantially impacted Mohawk's costs to dispose of the defective LVT. Throughout CW7's tenure at Mohawk in 2019, Mohawk worked on but could not fix the problems causing the LVT defects at its U.S. LVT factory.

88.    LVT product quality was an issue from the time Mohawk acquired the LVT assets from IVC Group in 2015, according to CW8. CW8 worked as a Regional Sales Manager for Mohawk from 2005 through 2019, and oversaw a

territory that went from New England to Michigan.[9] CW8 worked with distributors, who sold Mohawk products to smaller flooring companies (*i.e.*, not big box retailers like Home Depot). CW8 knew of problems with LVT quality that CW8 learned from his customers and sales representatives under him.

89.    According to CW8, the problems with Mohawk's LVT were numerous. "It was hurting our distributors' business," CW8 said. "They were getting blamed for it." The tile would peel up and didn't match the look and feel of the products IVC had previously made prior to Mohawk's acquisition. The tiles on display were different than what customers would actually end up with.

90.    "It was a nightmare for quite a while," CW8 said. "I don't know that they ever fixed it." Mohawk couldn't replicate the quality of LVT made overseas when Mohawk tried to make LVT in the U.S. As a result, for months at a time, Mohawk sales representatives could not fulfill orders for LVT because Mohawk did not have sufficient quality LVT.

---

[9] CW8 worked as a Regional Sales Manager for Mohawk from 2005 through 2019. CW8 was in charge of overseeing the sales activities of other salespersons who sold Mohawk products to distributors. CW8 reported to Vice President of Sales Paul Murfin.

91.    In addition to producing and storing defective LVT as first-rate inventory, Mohawk did the same with carpet. According to CW9, from May 2017 to September 2019, Mohawk produced excess carpet rolls with full knowledge that there were not customers waiting on them or buyers likely to purchase the surplus product.[10] This overproduction of carpet rolls came at a time when the Company had a backlog of inventory sitting around – inventory that Mohawk had maintained for years. The three large carpet distribution centers CW9 managed held enough old inventory on the books to fill up six million square feet of warehouse space. According to CW9, 30% of the carpet housed in the existing warehouses had been sitting there for longer than a year. The carpet that had been stored for a year or more was getting damaged, marred by creases that rendered it unusable. The main

---

[10] CW9 was a Senior Manager of Distribution Operations at Mohawk from May 2017 until September 2019. In that role, CW9 was responsible for managing the three main carpet distribution centers in Georgia. Prior to this role, CW9 worked for Mohawk as a Regional Operations Manager from 2017 until May 2019. CW9 acknowledged being FE8 in the Class Action Consolidated Complaint. CW9 spent hours speaking to Class Counsel and also spent considerable time speaking to Mohawk's counsel about what was attributed to FE8 in the Class Action. CW9 told Plaintiffs' counsel's investigator that Defendants' Counsel "basically tried to intimidate" him and wanted him to recant the allegations attributed to CW9/FE8 in the Class Action Consolidated Complaint. CW9 refused to recant, and indicated with respect to the allegations "nothing was innacurate."

carpet center in Georgia, which CW9 was responsible for, moved a couple trucks of carpet that had been stored for more than two years to Mohawk's "DRD facility" each day, and the DRD facility filled with old carpet that was unsaleable.

92.    Further, according to CW9, even with so much excess inventory – much of which had been on the books for two or three years – Mohawk wouldn't write off the worthless inventory. CW9 said that the Company left the dated, excess inventory on the books because it was making Mohawk's balance sheet look better than it otherwise would.

93.    According to CW9, Mohawk overproduced LVT and carpet to mask the Company's true sales. CW9 and fellow distribution managers joked, "You could print money by making inventory. Why would you stop producing product if it could just sit in inventory and prop up your balance sheet and make up for sales? Even if the quality was awful, they were never going to stop it." This overproduction of LVT and carpet also had the desired impact of artificially inflating Mohawk's reported margins.

**E.    Overproduction and Refusal to Write Down Inventory of Defective LVT and Carpet Caused Mohawk's Financial Results to Be False and Misleading**

94.    Generally speaking, and with respect to Mohawk, items in inventory have value to a business because it is expected that those goods can be sold and will generate profit at some point. When a company determines items in inventory have declined in value below the carrying value on the balance sheet, the company (Mohawk in this instance) must write down the value and create an allowance on its balance sheet. Writing down inventory thus reduces assets on the balance sheet.

95.    A write-down is treated as an expense, thus net income and retained earnings are also both reduced.

96.    A write-down also causes an increase in the Costs of Goods Sold (COGS). COGS is calculated as (i) the beginning inventory for reporting period, (ii) plus purchases made during that period, (iii) minus ending inventory. Write-downs therefore raise COGS, which has the effect of lowering gross profits and lowering operating income.

97.    Accordingly, had Mohawk taken an appropriate inventory write-down, it would have impacted both the Company's income statement and the balance sheet.

98.     During the relevant period, Mohawk assured investors the Company properly accounted for inventory. For instance, in February 2017, the Company falsely stated: "Inventories are stated at the lower of cost or market (net realizable value)" and that "[a]s of December 31, 2016, the Company has remediated the previously reported material weakness in its internal control over financial reporting related to the design, operation and documentation of internal controls related to the monitoring of inventory cycle counts and the valuation of obsolete inventory . . . ."

99.     Defendants also told investors Mohawk's inventory levels had grown to support geographic expansion, new product ramp-up, and because of rising raw material costs.

100.   As set forth above, Mohawk's inventories (particularly scrap LVT and massive stockpiles of carpet) were not growing for these reasons, but because Mohawk intentionally produced excess LVT and carpet to drive down the per unit cost of goods sold (COGS) and artificially inflate Mohawk's publicly reported margins and income.

101.   Defendants refused to write down the scrap LVT and unsaleable carpet that had been sitting in Mohawk's warehouses. Doing so would have caused

Mohawk to increase the cost of sales, decreasing margins and income, and reduce assets on the balance sheet.

102.   The enormity of the excess inventory caused Mohawk to incur substantial expenses, including refitting warehouse space and renting warehouse space.

103.   This overproduction – and the refusal to write down the inventory – of LVT and carpet occurred within Mohawk's Flooring North America Segment run by Defendant Carson, under Carson's direction.

**F.    Defendants Pump Up Quarterly Earnings by Stuffing the Channel and the Saturday Scheme in Violation of SEC Guidance and GAAP Requirements**

104.   Throughout the relevant period, Mohawk knowingly and repeatedly recognized revenue in violation of guidance provided by the United States Securities and Exchange Commission, basic rules of Generally Accepted Accounting Principles ("GAAP"), and the Company's own publicly stated revenue recognition principles.

105.   The SEC, applying basic GAAP, provided very straightforward rules for the recognition of revenue. "The [SEC] staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

Persuasive evidence of an arrangement exists, Delivery has occurred or services have been rendered, The seller's price to the buyer is fixed or determinable, and Collectibility is reasonably assured." Codification of Staff Accounting Bulletins, Topic 13: Revenue Recognition (internal citations omitted).[11] The SEC's guidance tracks GAAP.

106.   Indeed, the Company's (i) 2015 Form 10-K filed with the SEC on February 29, 2016, (ii) 2016 Form 10-K filed with the SEC on February 27, 2017, and (iii) 2017 Form 10-K filed with the SEC on February 28, 2018, all told investors the very clear criteria for recognition of revenue: "***Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured***."

---

[11] Mohawk was obligated to comply with the Codification of Staff Accounting Bulletins, Topic 13: Revenue Recognition through the reporting of its 2017 financial results in February 2018, as the Company did not adopt Accounting Standards Codification 606 until 2018. *See* 2016 Form 10-K ("The Company currently plans to adopt the provisions of this new accounting standard at the beginning of fiscal year 2018, and is currently assessing the impact on its consolidated financial statements."). Even after adopting Accounting Standards Codification 606 for its 2018 fiscal year, the basic revenue recognition principles relevant to this action remained the same.

107.   In the beginning of 2018, Defendants falsely assured investors the Company had adopted new GAAP for the recognition of revenue, had reviewed Mohawk's revenue recognition in prior accounting periods for compliance with GAAP, and the Company's revenue recognition complied with GAAP, such that no material changes needed to be made to the Company's practices. The Company publicly stated in its first quarter 2018 Form 10-Q:

> On January 1, 2018, the Company adopted the new accounting standard, ASC 606, Revenue from Contracts with Customers and all the related amendments ("ASC 606") and applied the provisions of the standard to all contracts using the modified retrospective method. The cumulative effect of adopting the new revenue standard was immaterial and no adjustment has been recorded to the opening balance of retained earnings. Prior year information has not been restated and continues to be reported under the accounting standards in effect for those periods.

> Substantially all of the Company's revenue continues to be recognized at a point in time when the product is either shipped or received from the Company's facilities and control of the product is transferred to the customer. ***The Company reviewed all of its revenue product categories under ASC 606*** and the only changes identified were that an immaterial amount of revenue from intellectual property ("IP") contracts result in earlier recognition of revenue, new controls and processes designed to meet the requirements of the standard were implemented, and the required new disclosures are presented in Note 3, Revenue from Contracts with Customers. ***The adoption of ASC 606 did not have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows.***

108.   In truth, at least as early as 2016, and throughout 2017 and the first quarter of 2018, Defendants knowingly caused Mohawk to recognize revenue in violation of the SEC's guidance, GAAP, and the Company's own publicly stated accounting principles and did so in a purposeful effort to meet Mohawk's and analysts' earnings and revenue projections.

109.   As set forth in detail below, Mohawk improperly recognized revenue on product shipped prematurely at the end of reporting periods because, among other things, (i) Mohawk had failed to reach an arrangement with the buyer to purchase the goods prematurely, and (ii) Mohawk had not delivered the goods to the purchaser.

110.   According to CW5, the Chief Information Officer for Mohawk Industries' Flooring Division from April 2014 until August 2017, the entire time he worked at Mohawk, the Company had a practice of shipping out product months ahead of schedule to meet projections. "It was a very common practice to ship out everything they could." "You could call it channel stuffing. That's exactly what they did for years. It was standard operating procedure."

111.   CW5 explained that toward the end of each quarter, Mohawk would pull one month or two months' worth of future orders and ship them out ahead of

time so that Mohawk could recognize the revenue prematurely. To meet the end-of-year sales goals in December, orders as forward-reaching as late February would be shipped out. ***These orders would then be sitting in parking lots in a shipping container for months because the customer would not want the expense of sending them back.***

112.   Per CW5, Mohawk's practice (undisclosed to the public) was that once product had left the factory, the revenue could be recognized. However, the Company wouldn't even invoice customers immediately – they would just put the revenue in the books.

113.   According to CW5, it was obvious to Company insiders what Mohawk was doing – recognizing revenue prematurely. Further, according to CW5, Defendant Carson was well aware of the routine practice of pulling in sales. According to CW5, it was clear and not a secret that Mohawk was shipping out product in order to manipulate earnings and ***Defendant Carson was present when the plan to ship product early was discussed weekly in staff meetings***. According to CW5, at these meetings it "was standard procedure" that attendees of the meetings would ask: "What orders can we pull in to hit our forecast?"

114.   CW6, a distribution manager/plant manager for Mohawk Industries at the Dalton Georgia distribution center from April 2014 to November 2019, described the same conduct at Mohawk as detailed above by CW5. According to CW6, at the end of each quarter there was a nationwide rush to get product off Mohawk's shelves and into the hands of retailers – ***whether or not the retailers needed or had requested the shipments***. This practice was so well known around the plant that those in distribution referred to the end of quarter push as "drain the swamp."

115.   According to CW6, the "drain the swamp" practice of end-of-quarter shipments to customers who had not ordered the product was national in scope and happened regularly. CW6 participated in regular end-of-quarter conference calls with distribution managers from all over the U.S., in which supervisors (including Director Logistics Operations Jeremy Tatum and VP Logistics & Distribution Dan Flowers) instructed the group to "drain the swamp." Everyone was familiar with the concept. This happened nearly every quarter.

116.   The goal of "draining the swamp," according to CW6, was (i) to move product that had **__NOT__** been ordered, and (ii) "to get the sales in that quarter or that month" so the Company could hit its established numbers.

117.   According to CW6, part of "draining the swamp" was to ship millions of pounds of product on the last Saturday of the quarter. Shipping on Saturdays (the "Saturday Scheme") was done to meet financial projections by (i) unloading defective LVT on customers who, if they were on site, otherwise would reject it as defective, and (ii) to deliver product prematurely to retailers, *i.e.*, foist Mohawk's excess inventory on customers. According to CW6, the Saturday Scheme resulted in millions of pounds of fake shipments being sent on the final Saturday of each quarter. Further, according to CW6, Mohawk's practice of shipping unexpected, unwanted, and defective product was ruining Mohawk's relationship with its customers.

118.   According to CW9 (identified as FE8 in the Class Action Consolidated Complaint), Mohawk utilized the Saturday Scheme to inflate its sales in every quarter of the relevant period, except when the Company temporarily abandoned the scheme in the second and third quarters of 2018. CW9, who was a Senior Manager of Distribution Operations at Mohawk from *May 2017 to September 2019*, explained that Mohawk conducted its Saturday Scheme quarter-end practice *in every quarter of his tenure prior to the second quarter of 2018*. The goal of the Saturday Scheme was to juice Mohawk's revenues for the quarter

119.  Further, according to CW9, in Q2 and Q3 2018, Vice President of Warehouse and Delivery Operations Matthew Witte and Vice President of Logistics Dan Flowers instructed staff that Mohawk was not going to do their normal end-of-quarter practice of dumping inventory on customers. In Q2 and Q3 2018, Mohawk was too far away from making its financial targets such that it did not make sense to make up the difference in the usual manner by pulling in sales in violation of accounting rules. CW9 said Company executives knew that, even with the scheme, Mohawk was too far off to hit its financial targets in those quarters.

120.  Mohawk employed the Saturday Scheme from at least 2015 through the first quarter of 2020. Former employees such as CW10 (a Manager for a Regional Distribution Center for Mohawk Industries from May 1999 until April 2016) and CW11 (a Logistics Business Analyst and a Supply Chain Analyst for Mohawk from January 2019 until April 2020) describe an amazingly consistent practice of shipping on the last Saturday of the quarter over a span of approximately five years.

121.  CW10 was personally told to instruct CW10's employees to make deliveries on Saturdays, even though both CW10 and Mohawk knew the customers

were closed.[12] According to CW10, this practice, the Saturday Scheme, was synonymous with "Draining the Swamp." Later, CW11 would be required to work the last Saturday of every quarter to participate in what CW11 called the "end of quarter push." As CW11 described it, the Company would deliver inventory to customers across the country on these Saturdays, many of whom were closed, in an attempt to classify the orders as shipped and book the revenue prior to the quarter closing.[13]

122.   CW11 explained that Mohawk knew 80% of the customers were closed on Saturdays, and even those that were open did not usually accept deliveries on Saturdays, but the Company paid drivers to attempt to make the deliveries so that the Company could mark the inventory as shipped. Mohawk knew which customers were closed, because Mohawk required customers to provide it with their

---

[12] CW10 worked as a Manager for a Regional Distribution Center and reported to Regional Director Matt Witte. CW10 oversaw operations and employees at nine warehouses in the southeastern United States.

[13] CW11 worked from January 2019 until August 2019 as a Supply Chain Analyst, and from August 2019 until April 2020 as a Logistics Business Analyst for Mohawk. CW11 was identified as FE6 in the Class Action Complaint. CW11 was directly involved with reporting shipping information and returns for warehouses in North America. CW11 generated reports sent out via email to other Mohawk employees that documented such shipments.

hours for receiving shipments. According to CW11, it was no mistake that Mohawk shipped to these customers on Saturdays when they would not accept the shipments.

123.    Similarly, according to CW10, truckdrivers regularly were unable to deliver product on Saturdays. CW10 estimated that more than 80% of the materials shipped as part of the Saturday Scheme came back to Mohawk on the same Saturday the shipments were attempted.

124.    According to CW10, the Saturday Scheme was not isolated to CW10's region, but occurred all over the United States. CW10 knew this based on CW10's conversations with other regional managers. Similarly, CW11 recognized the shipments were material. The shipments on these Saturdays would typically total about three million pounds of materials, and the revenue booked on each end-of-quarter Saturday was in the millions.

125.    According to both CW10 and CW11, the Saturday Scheme was never done in the middle of the quarter, but always the end of the quarter.

126.    Mohawk's senior managers, including Mohawk's CEO, received regular reports of sales activity showing spikes in sales on the last day of each quarter, according to CW12. CW12 was an Operations Analyst in the Finance IT department from June 2018 to March 2020. CW12 checked the accuracy of data in

daily and periodic reports tracking sales activities, which reports were sent to all C-level executives including CEO Lorberbaum. According to CW12, these reports evidenced Mohawk's efforts to ship product at the end of reporting periods. Indeed, when CW12 recognized a "huge spike" in sales at the end of a reporting period, CW12 "wondered if I needed to hold the reports and get the data corrected." CW12's supervisor told CW12 that such spikes were normal because salespeople always tried to make sales at the end of the quarter.

### G.   Mohawk's Fraudulent Scheme Proves to Be Unsustainable; Mohawk is Forced to Report That Its True Financial Condition is Not Nearly as Good as Defendants Previously Misled Plaintiffs to Believe

127.   Mohawk's true financial condition was not as good as Defendants publicly represented. Mohawk could not achieve earnings and revenue estimates through legitimate means. Mohawk had to resort to illegitimate means to meet earnings and revenue estimates, as detailed herein.

128.   Defendants' scheme to meet and/or exceed earnings and revenue estimates each quarter was predicated on, among other things, (i) lying about the Company's ability to build quality LVT, selling defective LVT as first quality, and refusing to write-down inventories of unsellable defective LVT and carpet, (ii) over-production of carpet and LVT in excess of what could be sold, to drive down

COGS, (iii) bringing future sales forward into the current reporting period to falsely inflate the reported current period earnings, without the customer's consent for the sale, (iv) abuses of customers by delivering defective product, misrepresenting product quality, and/or delivering product prior to when the customer wanted it, causing significant damage to Mohawk's customer relationships and its long-term business well-being. However, this scheme could not continue indefinitely. Customers would not continue to purchase LVT from Mohawk that was defective. There was a limit to how much excess carpet and LVT could hide in inventory. And, pulling future sales into earlier quarters makes it more difficult to make sales in those future periods because the true demand for the product did not really exist (as if the sales were real).

129.   Defendants' scheme to meet earnings and revenue estimates via illegitimate means caused Mohawk to dig a deeper and deeper hole for itself to get out of at the beginning of each quarter – until the hole became insurmountable.

130.   By the second quarter of 2018, Defendants' scheme proved to be unsustainable. There was a limit to how much defective product Mohawk could sell or store indefinitely as inventory, and to how much Mohawk could record in the present reporting period sales from future quarters. In the second quarter of 2018,

the Company's gap to achieve its own and analysts' forecasts for Mohawk's earnings and revenues became insurmountable.

131. Whereas Defendants had lied about Mohawk's true financial condition in 2017 and the first half of 2018, on July 25, 2018, after the second quarter of 2018, Defendants partially revealed the truth that Mohawk's financial condition was not nearly as good as Defendants had previously told investors. This caused Plaintiffs' substantial economic loss.

132. On July 25, 2018, after the market closed, Mohawk reported its financial results for the second quarter of 2018 (the "7.25.18 Press Release"). Mohawk "announced 2018 second quarter net earnings of $197 million and diluted earnings per share (EPS) of $2.62. Adjusted net earnings were $263 million and EPS was $3.51, excluding restructuring, acquisition and other charges, a 6% decrease from last year."

133. Mohawk's reported earnings and revenues fell well short of guidance and expectations. The Company had guided to earnings per share of $3.89 - $3.90. Mohawk and Defendant Lorberbaum acknowledged both the earnings shortfall and that it was caused by the North America Flooring Division run by Defendant Carson. The 7/25/18 Press Release stated: "Commenting on Mohawk Industries'

second quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, 'Our results fell short of our expectations, and we are taking actions to improve the performance of our U.S. businesses.'"

134.   Defendants' fraud had been isolated in the North America Flooring Division run by Defendant Carson. The Company's 7/25/18 Press Release acknowledged that Mohawk's businesses unrelated to the fraud had performed well in the quarter and were not responsible for the earnings miss. The 7/25/18 Press Release stated: "Our businesses outside North America showed significant improvement" and "the results in most of our non-U.S. businesses improved substantially."

135.   On July 25, 2018, CNBC reported: "Shares of Mohawk Industries tumbled more than 14 percent in after-hours trading. The world's largest flooring company missed on both analysts' earnings and revenue expectations for its second quarter. Mohawk reportedly earned $3.51 per share versus the $3.90 that was estimated. The company generated $2.58 billion in revenue versus the analysts' estimated $2.60 billion."

136.   The next day, on July 26, 2018, *The Motley Fool* reported: "Shares of Mohawk Industries (NYSE:MHK) plunged in Thursday trading just hours after the

flooring manufacturer reported a big earnings miss on Wednesday evening. As of 2:45 p.m. EDT, Mohawk shares are down a whopping 16%. Expected to report earnings of $3.88 per share, Mohawk reported adjusted earnings of $3.51 -- and GAAP profits of only $2.62." The article further acknowledged "***actual GAAP profits fell off a cliff – down 25% year over year***."

137.   On July 26, 2018, Mohawk held a conference call for analysts and investors like Plaintiffs. During the call, Defendant Lorberbaum again acknowledged the Company missed financial targets because of problems in the North America Flooring Division run by Defendant Carson: "Our second quarter results fell short of our expectations and we are taking actions to improve the performance of our U.S. businesses." In addition, the Company partially admitted to some facts previously concealed. For instance, the Company admitted it had to sell down impaired product from the Flooring North America division's inventories during the period: "For the second quarter, we accelerated sales of impaired Mohawk inventory. . . ." Similarly, Defendants admitted inventories were high in the Flooring North America division and had to be reduced: "we produced less than we sold to reduce inventory."

138.   During the call, Mohawk also told investors "our EPS guidance for the third quarter is $3.54 to $3.64, excluding any one-time charges." This guidance was substantially below what investors had expected.

139.   On July 25, 2018, Mohawk's stock price closed at $217.37 per share. On July 26, 2018, after the Company reported its terrible second quarter results, the stock closed at a price of $179.31. This decline of $38.06 per share on heavy volume, represented a fall of 18% and erased over $2.7 billion of shareholder market capital.

140.   Upon digesting this Mohawk specific news, Plaintiffs sold all of their shares of Mohawk stock over the next three months.

**H.   Continuing Revelations of Defendants' Wrongful Conduct**

141.   Mohawk's underlying business continued to suffer from the fraudulent scheme into the third quarter of 2018. On October 26, 2018, Mohawk once again reported disastrous financial results.

142.   As summarized in *Barron's*, Mohawk's financial results were well below expectations again and this would persist: "The flooring-products firm earned $3.29 a share on revenue of $2.55 billion. Analysts were looking for EPS of $3.58 on revenue of $2.6 billion. The company warned that it expects soft trends to

continue. . . . For the fourth quarter, it sees EPS of $2.45 to $2.60, compared with the $3.50 consensus estimate."

143.   In the Company's press release, Defendant Lorberbaum is quoted: "Our third quarter results fell short of our expectations. Sales growth in all segments was lower than our estimates . . . . *Additional manufacturing reductions were required during the period to control our inventory levels*."

144.   During the Company's conference call on the third quarter 2018 financial results, Defendant Lorberbaum admitted that Mohawk's LVT manufacturing facility in the U.S. had serious problems impacting production, specifically that it "had both software problems, that the software as we tried to speed it up and make it work, the software was not talking to itself properly, and we also had physical mechanical failures where things broke and we had to replace them."

145.   Further, the Flooring North America Segment had lower margins due, in part, to "lower than expected production." The Company couldn't continue to boost margins (lowering unit costs) by producing more product than it could sell.

146.   As a result of this news, Mohawk's stock price declined on October 26, 2018 by 24%, a drop of $36 from $151.07 per share to $115.03 per share.

147.   On November 13, 2018, Mohawk announced that "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests." Defendant Carson – one of the primary architects of the fraud –was unceremoniously fired.

148.   Mohawk's underlying business continued to suffer from the fraudulent scheme into the second quarter of 2019. On July 25, 2019, after the market closed, Mohawk once again reported having excess inventory and lower margins. Sales and margins declined substantially in the North America Flooring segment. As a result of this news, Mohawk's stock price declined on July 26, 2019, dropping $27.52, from $156.36 per share to $128.84 per share, and erasing $2 billion in shareholder value.

149.   On June 29, 2020, Lead Plaintiff filed the Class Action Consolidated Complaint, which publicly revealed, among other things, (i) the Saturday Scheme to inflate sales in violation of GAAP, and (ii) Mohawk's hiding of unsaleable "scrap" LVT in its ballooning inventories, which the Company carried at elevated prices in violation of GAAP.

150.   On July 13, 2020, Mohawk filed a Form 8-K with the SEC disclosing that the Company had received subpoenas from the DOJ and the SEC concerning the issues raised by this action. The Form 8-K stated:

> On June 29, 2020, an Amended Class Action Complaint for violations of federal securities laws was filed against Mohawk and its CEO Jeff Lorberbaum in the Northern District of Georgia. The complaint alleges that the Company (1) engaged in fabricating revenues by attempting delivery to customers that were closed and recognizing these attempts as sales; (2) overproduced product to report higher operating margins and maintained significant inventory that was not salable; and (3) valued certain inventory improperly or improperly delivered inventory with knowledge that it was defective and customers would return it. The Company intends to vigorously defend itself in the lawsuit.

> On June 25, 2020, the company received subpoenas issued by the U.S. Attorney's Office for the Northern District of Georgia and the U.S. Securities and Exchange Commission on topics similar to those raised by the amended complaint. The company is cooperating with those authorities.

151.   This series of partial disclosures revealed to investors, over time, that the true financial condition of Mohawk was not what Defendants had represented to investors in 2017 and the first half of 2018. These disclosures resulted in substantial declines of Mohawk's stock price on the date of the news disclosures individually, and in the aggregate as Mohawk's stock declined by more than 54%, from a price of over $280 in January 2018 to $128 in July 2019.

## VI.   RELIANCE

152.   Defendants lied about and/or concealed from investors the Company's true earnings and financial condition, the cause of the Company's increasing earnings, and the sustainability of the Company's business practices. Defendants caused Mohawk to manipulate its revenues and inventory levels. Plaintiffs, through their investment adviser Maverick Capital, Ltd. and its professional money managers, diligently studied Mohawk's business, with a particular eye towards the Company's earnings and the sustainability of those earnings, and the accuracy of its income statement and balance sheet. As a result, Plaintiffs and Maverick Capital, Ltd. were misled by Defendants' statements alleged herein in § VII.

153.   The false and misleading statements set forth herein in § VII were widely disseminated to the securities markets, investment analysts and to the investing public, including Plaintiffs. Those statements caused and maintained the artificial inflation of the price of Mohawk common stock, which consequently traded at prices in excess of its true value.

154.   Plaintiffs, through their investment manager Maverick Capital, Ltd., read, or listened to, and relied on Defendants' materially false and misleading statements alleged herein prior to purchasing Mohawk shares. Plaintiffs specifically

read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's financial results, disclosures concerning Mohawk's internal controls, and Mohawk's ability to adjust to the changing landscape in the flooring market resulting from the advent of LVT, as identified in §VII.

155.   Plaintiffs and their investment manager are professional investors, who routinely engage in thorough research before purchasing any security and continue to monitor all of their investments through extensive research. This research routinely includes a review of relevant media, research analyst reports, SEC filings, press releases, conference calls, and any other information source likely to provide important information on the business.  Plaintiffs' investment in Mohawk was no different.

156.   Prior to purchasing shares of Mohawk common stock, Maverick Capital, Ltd. took specific actions to ensure that in performing its duties as an investment manager, it never purchased any security without first reading SEC filings and analyst reports related to the issuer and/or the specific security. Indeed, Maverick Capital, Ltd. had a pattern and practice of always reading and reviewing available SEC filings and analyst reports prior to making investments (and

continuing to monitor these reports). As part of their job functions, employees of Maverick Capital, Ltd. had the responsibility to read and review available SEC filings and analyst reports. Maverick Capital, Ltd.'s specific actions to ensure it read and reviewed available SEC filings and analyst reports prior to making an investment decision applied with equal force to its decision to invest in Mohawk, and Maverick Capital, Ltd. did in fact read and review available SEC filings and analyst reports.

157.   Maverick Capital, Ltd. and Plaintiffs reasonably and justifiably relied on Defendants' false and misleading statements in deciding to purchase Mohawk shares in 2018. Maverick Capital, Ltd. and Plaintiffs were ignorant of the truth concerning Defendants' wrongful conduct, as detailed in §V, and believed the false and misleading statements detailed in §VII to be complete and truthful.

158.   Had Maverick Capital, Ltd. or Plaintiffs read a truthful account of Mohawk's business practices alleged in §V, including Mohawk's efforts to meet quarterly financial goals by pulling in sales through the Saturday Scheme and hiding defective LVT (and other product) as top-quality inventory, as well as Mohawk's lack of internal controls over financial reporting and general business activities alleged herein, Maverick Capital, Ltd. and Plaintiffs would not have decided to

purchase Mohawk shares. Disclosure of Mohawk's true business practices, as alleged herein, would have indicated to Maverick Capital, Ltd. and Plaintiffs that any investment in Mohawk at prevailing prices for its stock would be unjustified.

159.   Plaintiffs are also entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all relevant times, the market for Mohawk's publicly-traded common stock was efficient for the following reasons, among others:

a.      Mohawk common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Mohawk filed regular reports with the SEC;

c.      Mohawk regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.      Mohawk was regularly followed by numerous securities analysts employed by major brokerage firms headquartered in the United States and

overseas who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Many of these reports were publicly available and entered the public marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Mohawk's securities; and

f.      Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired Mohawk common stock between the time that Defendants made the material misrepresentations and omissions and the time that the relevant truth concerning Mohawk's financial condition was revealed, during which time the price of Mohawk common stock was artificially inflated by the Defendants' misrepresentations and omissions.

160.   As a result of the foregoing, the market for Mohawk common stock promptly reacted to current information regarding Mohawk from publicly available sources and reflected such information in the trading price of Mohawk common stock. Under these circumstances, a presumption of reliance applies pursuant to the fraud-on-the-market doctrine.

161.   Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market.

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

162.   Plaintiffs purchased approximately 1.4 million Mohawk common shares beginning on or about January 19, 2018, and continued to purchase Mohawk shares until on or about June 6, 2018. Plaintiffs specifically read (and/or listened to) and relied upon the false and misleading statements alleged herein, which include the false and misleading statements contained in: (i) Mohawk's annual, quarterly, current, and special reports filed with and/or furnished to the SEC; and (ii) Mohawk's presentations and conference calls with analysts and investors. Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's earnings, profit margins, sales of LVT, inventory levels, internal controls, and operational condition.

163.   Plaintiffs through their investment manager, Maverick Capital Ltd, reviewed, read, and relied upon Defendants' false and misleading statements prior to purchasing Mohawk shares.

164.  Defendants' false and misleading statements impacted investors' decision (including Plaintiffs' decision) to purchase Mohawk shares because Defendants' statements falsely assured investors (including Plaintiffs) that Mohawk, among other things, reported earnings in compliance with GAAP, manufactured high-quality LVT that customers desired and not a high percentage of defective LVT, did not carry defective LVT and carpet as inventory, maintained effective internal controls, properly conducted and accounted for sales, and did not engage in deceptive business practices to meet quarterly financial targets. Had Plaintiffs read a truthful account of Mohawk's underlying business activities, Plaintiffs would not have decided to purchase Mohawk stock.

165.  The publicly available false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public. Those statements caused and maintained the artificial inflation of the price of Mohawk common stock, which consequently traded at prices in excess of its true value.

### A.    Fourth Quarter and Full-Year 2016

166.   On February 9, 2017, Mohawk issued a press release and filed it with the SEC (the "2.9.17 Press Release"), which had been approved and/or made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2016 fourth quarter record net earnings of $234 million and diluted earnings per share (EPS) of $3.13, a 22% increase versus prior year. Excluding restructuring, acquisition expenses and other charges, net earnings were $243 million, and EPS was $3.26, a 16% increase over last year's fourth quarter adjusted EPS. Net sales for the fourth quarter of 2016 were $2.2 billion, up 9% versus the prior year's fourth quarter as reported and 7% on a legacy basis applying constant days and currency rates.

167.   The 2.9.17 Press Release also read: "For the twelve months ending December 31, 2016, net earnings and EPS were $930 million and $12.48, respectively."

168.   The 2.9.17 Press Release continued:

> Commenting on Mohawk Industries' fourth quarter and full year performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "In the fourth quarter, our sales and earnings per share set records for the period. Our operating margin for the quarter rose to 14.0%, a 150 basis point improvement over the prior year and the highest fourth quarter result in the company's history."

> "For the full year, Mohawk delivered an outstanding performance. Our revenues for the year rose to an all-time high, our EBITDA increased to $1.7 billion and we generated adjusted operating

income of $1.3 billion, up 24% over the prior year, the highest in our history."

169.   Further, the Company and the Individual Defendants touted the results of the Flooring Division, and its future prospects: "'During the quarter, our Flooring North America Segment's sales increased 10% as reported or 8.5% on a constant day's basis. Operating income grew 18.5% to a margin of 14.5% as reported, or 15% excluding restructuring, integration and other charges. . . .  Our hard surface sales, including LVT, laminate, wood and vinyl, continued their dramatic expansion. ***Our LVT plant made significant improvements during the period, and we are installing another production line that will double our U.S. capacity by the end of this year***.'"

170.   The 2.9.17 Press Release continued quoting Defendant Lorberbaum:

> "Today, Mohawk is in the best position in the company's history. In 2016, we delivered record results as our investment strategy to enhance our product innovation, brands and service continued to benefit our customers and provide the returns we expected. In 2017, we anticipate sales to grow similarly to last year on a local basis with operating margins improving slightly, excluding acquisitions and intellectual property. . . .Taking all of this into account, our EPS guidance for the first quarter of 2017 is $2.64 to $2.73, which represents an 11% to 15% increase over first quarter 2016."

171.   As detailed in §§ V.D., V.E., and V.F., Defendants' statements in the 2.9.17 Press Release were false and misleading for the following reasons: (i)

Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS; (ii) Mohawk's LVT plant produced excessive (more than 50%) of product that was defective, thus rendering Defendant Lorberbaum's statement that "'[o]ur LVT plant made significant improvement'" misleading; and (iii) It was misleading to assert "'Mohawk is in the best position in the company's history'" and provide sales growth and earnings growth projections, without disclosing the Company had obtained 2016 financial metrics via the schemes described herein.

172.   After the Company issued the 2.9.17 Press Release, on February 27, 2017, the Company filed its Form 10-K with the SEC (the "2016 Form 10-K"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 2016 Form 10-K repeated the same false financial results reported in the 2.9.17 Press Release indicated above. The financials in the 2016 Form 10-K were false and misleading for the same reasons set forth with respect to the 2.9.17 Press Release.

173.   In addition, the 2016 Form 10-K falsely stated: "Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured." In truth, as detailed herein at § V.F., the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers.

174.   The 2016 Form 10-K also falsely stated: "Inventories are stated at the lower of cost or market (net realizable value)." In truth, as detailed herein at § V.E., the Company carried in its inventory material amounts of defective LVT and carpeting that had not been marked down to the lower of cost or market (net realizable value).

175.   The 2016 Form 10-K also falsely assured investors the Company and Defendants had implemented proper internal controls to monitor inventory levels. Notably, on November 10, 2016, the Company admitted in a Form 10-Q filing that it had been caught by the Public Company Accounting Oversight Board not implementing proper internal controls:

> Based on an evaluation of the effectiveness of the Company's disclosure controls and procedures, as of the end of the period covered by

this report, the Company's Chief Executive Officer and Chief Financial Officer *have concluded that such controls and procedures were ineffective* at a reasonable assurance level as of the end of the period covered by this report and as of December 31, 2015, *because of a material weakness in internal control over* financial reporting related to documenting management's *inventory* control oversight. Management's conclusion was prompted by questions raised during the Public Company Accounting Oversight Board's routine inspection of the Company's independent registered public accounting firm.

176. The 2016 Form 10-K falsely stated the weakness in internal controls over inventory accounting previously identified on November 10, 2016 had been fixed:

As of December 31, 2016, the Company has remediated the previously reported material weakness in its internal control over financial reporting related to the design, operation and documentation *of internal controls related to the monitoring of inventory* cycle counts and *the valuation of obsolete inventory* at two of the Company's divisions. The remediation was accomplished by updating policies that require specific monitoring activities occur at defined levels and management's conduct of monitoring activities for the inventory cycle counts and the valuation of obsolete inventory in these divisions be evidenced upon completion.

The Company has completed the documentation, implementation and testing of the effectiveness of the design and operation of the remediation actions described above and, *as of December 31, 2016, has concluded that the steps taken have remediated the material weakness*.

177. Defendants' above statements concerning the Company's internal controls related to accounting for its inventory levels were false and misleading

because, as alleged herein at § V.E., it was widely known within Mohawk that the Company was storing large amounts of defective and unsellable LVT and carpet carried as inventory at inflated valuation. Accordingly, the Company had not remediated material weaknesses in its internal controls over accounting for inventory.

178.   At or about the same time the Company issued its 2016 Form 10-K, the Company issued its 2016 Annual Report to Shareholders (the "2016 Annual Report") that was posted to the Company's website (where it remained through, at a minimum, March 2021). The 2016 Annual Report was approved by and/or made on the basis of information provided by the Individual Defendants.

179.   In the 2016 Annual Report, Defendants misleadingly stated: "***While some public companies focus on meeting quarterly expectations or maximizing results in a given year, we focus on building a company that will last forever***. It's a philosophy that has served our shareholders well, as Mohawk has outperformed the market for more than two decades." This statement continued to mislead investors, like Plaintiffs, throughout the relevant period. As detailed herein at §§ V.D., V.E., and V.F., the Company was aggressively selling sub-standard quality LVT and pulling in sales from future periods to meet quarterly earnings estimates

during 2016, 2017 and the first quarter of 2018, and in so doing Mohawk jeopardized its relationships with customers and its ability to make sales in those future periods. In truth, and contrary to the Company's express statements in the 2016 Annual Report, Mohawk was focused on meeting quarterly numbers and not its long-term business prospects.

180.   In the 2016 Annual Report, Defendant Lorberbaum also wrote in his letter to investors: "Mohawk's performance in 2016 was a success by every measure." Defendant Lorberbaum continued:

> A particular area of focus is luxury vinyl tile (LVT), one of the flooring industry's newest and fastest-growing products. Noted for its durability, affordability and realistic visuals, LVT represents a major growth opportunity for Mohawk. ***At present, sales of LVT are outpacing our manufacturing capacity.*** That's why by the end of 2017, we will expand our U.S. and European LVT capacity to further extend our leadership in this category.

181.   It was misleading for Defendant Lorberbaum to claim "2016 was a success by every measure" without disclosing the true facts known to him, including the primary "measures" by which investors judged Mohawk – including revenues, earnings, and margins – had been manipulated by Defendants. *See* §§ V.D., V.E., and V.F. It was similarly misleading to tell investors Mohawk was capacity constrained in the sale of LVT. As CW6 has confirmed, Mohawk was not capacity

constrained. Mohawk was able to produce excess amounts of **defective** and **unsaleable** LVT, such that Mohawk had stored millions of square feet of LVT in warehouses indefinitely. *See* ¶¶83-86.

### B.    First Quarter 2017

182.   On April 27, 2017, Mohawk issued a press release and filed it with the SEC (the "4.27.17 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 first quarter record net earnings of $201 million and diluted earnings per share (EPS) of $2.68, a 16.5% increase versus prior year. Excluding restructuring, acquisition expenses and other charges, net earnings were $203 million, and EPS was $2.72, a 14% increase over last year's first quarter adjusted EPS. Net sales for the first quarter of 2017 were $2.22 billion, up 2% versus the prior year's first quarter as reported and 4% applying constant days and currency rates. . . .

> Commenting on Mohawk Industries' first quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "Our sales and earnings per share set records for the first quarter with volume, mix and productivity adding approximately $60 million to operating income. Our operating margin for the quarter rose to 12.4%, a 110 basis point improvement over the prior year and the highest first quarter result in the company's history.

183.   Defendants' statements in the 4.27.17 Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants'

schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS, as detailed in §§ V.D., V.E., and V.F.

184.   The 4.27.17 Press Release also falsely assured investors the Company's LVT was "well accepted" by customers because of its "superior" quality: "With their *superior design and performance*, our flexible, rigid and commercial LVT collections *are being well accepted* across all channels of the market." In truth, as detailed in §§ V.D., the Company's LVT production was riddled with defects and, what was sellable, was not first quality. Mohawk's LVT was inferior to other brands, and had not been well accepted by customers. Indeed, Home Depot met regularly with Mohawk and discussed the problems with Mohawk's LVT.

185.   After the Company issued the 4.27.17 Press Release, Mohawk held a conference call for investors on April 28, 2017 (the "4.28.17 Conference Call"). During the 4.28.17 Conference Call, Defendant Lorberbaum stated: "Sales of our hard surface products continue to expand at a higher rate with our LVT and premium laminate growing the fastest. ***With their superior design performance,***

*our flexible, rigid and commercial LVT collections are being well accepted across all channels.* The continued improvement of our LVT manufacturing process is increasing our capacity and margins." Defendant Lorberbaum's statements concerning LVT during the 4.28.17 Conference Call were false and misleading for the same reasons as set forth above in the preceding paragraph with respect to the 4.27.17 Press Release.

186.    During the 4.28.17 Conference Call, Defendants misleadingly attributed higher margins to increases in productivity (among other things) without disclosing the impact of pulling in sales and overrunning production lines to build product that there was no demand for. For instance, Mohawk's CFO Frank Boykin stated: "Operating margin, excluding charges was 12.6%. This is 100 basis point improvement over last year. This includes productivity of $41 million, volume of $9 million in [sic] price mix of $9 million." In truth, Mohawk artificially inflated the Company's operating margins by overproducing both carpet and LVT to drive down COGS in the short term, even though the Company had millions of square feet of LVT and carpet stored in warehouses with no customer demand for it. *See* §§ V.E., and V.F.

187.   During the 4.28.17 Conference Call, Defendants also misleadingly attributed higher inventories to positive causes. For instance, Mohawk's CFO Frank Boykin stated: "Inventories were $1.741 billion with inventory days at 110 compared to 107 days last year *impacted by geographic expansion and product growth*." In truth, the rise in inventories was attributable to the Company storing millions of square feet of carpet and LVT in inventory that was unsaleable and/or there was no customer demand for, and which should have been written down in value but was not. *See* § V.E.

188.   After the Company issued the 4.27.17 Press Release and hosted the 4.28.17 Conference Call, on May 5, 2017 the Company filed its Form 10-Q Quarterly Report with the SEC (the "1Q2017 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 1Q2017 Form 10-Q repeated the same false financial results reported in the 4.27.17 Press Release indicated above, which financial results were false and misleading for the same reasons set forth with respect to the 4.27.17 Press Release.

189.   The 1Q2017 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

For the three months ended April 1, 2017, net earnings attributable to the Company were $200.6 million, or diluted earnings per share ("EPS") of $2.68, compared to the net earnings attributable to the Company of $171.5 million, or diluted EPS of $2.30, for the three months ended April 2, 2016. The increase in diluted EPS for the three months ended April 1, 2017 was primarily attributable to increased sales volumes, savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, lower interest rates and the favorable impact of foreign exchange rates on transactions, partially offset by higher input costs, increased employee costs, and costs associated with investments in new product development, sales personnel, and marketing.

190. Similarly, the 1Q2017 Form 10-Q attributed Mohawk's operating income to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

Operating income for the three months ended April 1, 2017 was $274.8 million (12.4% of net sales) reflecting an increase of $29.1 million, or 11.8%, compared to operating income of $245.7 million (11.3% of net sales) for the three months ended April 2, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $41 million, increased sales volumes of approximately $9 million and the favorable net impact of price and product mix of approximately $9 million, partially offset by higher input costs of approximately $22 million, including increased material costs of approximately $11 million, and approximately $8 million of costs associated with investments in new product development, sales personnel, and marketing.

191. Defendants made similarly misleading statements in the 1Q2017 Form 10-Q attributing the Company's increase in operating earnings at the Flooring North

America segment to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> *Flooring NA segment* – Operating income was $92.1 million (9.8% of segment net sales) for the three months ended April 1, 2017 reflecting an increase of $16.8 million compared to operating income of $75.4 million (8.3% of segment net sales) for the three months ended April 2, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $13 million, and increased sales volumes of approximately $5 million.

192.  Defendants' statements in the 1Q2017 Form 10-Q concerning the increase in earnings and operating income were false and misleading because these metrics had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS, as detailed in §§ V.D., V.E., and V.F.

193.  In the 1Q2017 Form 10-Q, Defendants also falsely assured investors the Company had adopted ASU 2015-11, Simplifying the Measurement of Inventory, and was in compliance with the GAAP rule. The 1Q2017 Form 10-Q stated: "The Company adopted the provisions of this update at the beginning of fiscal year 2017. This update did not have a material impact on the Company's consolidated financial statements." In truth, Mohawk carried millions of square feet

of excess carpet and defective LVT in inventory at inflated values and refused to write down this inventory as required by GAAP. *See* § V.E.

194.   In the 1Q2017 Form 10-Q, Defendants falsely assured investors the Company was actively assessing its revenue recognition practices for compliance with new GAAP requirements.

> In May 2014, the FASB issued Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers. . . . The Company will adopt the provisions of this new accounting standard at the beginning of fiscal year 2018, using the cumulative effect method, and continues to evaluate the impact of the adoption of ASC 606 on its consolidated financial statements. The Company expects to complete its assessment of the impact of adoption of ASC 606 during the first half of 2017.

195.   Defendants' statements concerning Mohawk's "assessment" of its revenue recognition practices were false and misleading because, among other things, Defendants knew or recklessly disregarded the Company's channel stuffing practices and Saturday Scheme violated the Mohawk's publicly stated revenue recognition policies, then-existing GAAP and SEC guidance, and the new accounting standards to be implemented in 2018. *See* § V.F.

### C.     Second Quarter 2017

196.    On July 27, 2017, Mohawk issued a press release and filed it with the

SEC (the "7.27.17 Press Release"), which had been approved by and/or otherwise

made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 second quarter record operating income of $356 million, net earnings of $261 million and diluted earnings per share (EPS) of $3.48. Excluding restructuring, acquisition and other charges, net earnings were $278 million and EPS was $3.72, a 7% increase over last year's second quarter adjusted EPS. Net sales for the second quarter of 2017 were $2.5 billion, up 6% versus the prior year's second quarter or an increase of approximately 8% on a constant days and currency basis. . . .

> For the six months ending July 1, 2017, net earnings and EPS were $461 million and $6.17, respectively. Net earnings excluding restructuring, acquisition and other charges were $482 million and EPS was $6.44, an increase of 10% over the 2016 six-month period adjusted EPS. For the six-month period, net sales were $4.7 billion, an increase of 4% versus prior year as reported or 6% on a constant days and currency basis . . . .

> Commenting on Mohawk Industries' second quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "During the period, Mohawk delivered record results, generating the highest sales, adjusted operating income and adjusted EPS in the company's history."

197.   The 7.27.17 Press Release also asserted the North America Flooring Segment's sales had increased by 6%, with operating margins of 12% and operating income rising 12%.

198.   Defendants' statements in the 7.27.17 Press Release concerning earnings, revenues and margins were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS, as detailed in §§ V.D., V.E., and V.F.

199.   After the Company issued the 7.27.17 Press Release, Mohawk held a conference call for investors on July 28, 2017 (the "7.28.17 Conference Call"). During the 7.28.17 Conference Call, Mohawk's CFO misleadingly attributed the growing amount of inventory (increasing to 109 days of merchandise from 105 days of merchandise in the prior year) "to raw material inflation and more sourced product needed to support our LVT, ceramic, and countertop businesses." Defendant Lorberbaum reiterated the increase in inventory was due to inflation and

growing the business, "as the material cost go up all of that flows into the inventory immediately" and because "we are building our businesses in different places."

200.   Defendants' statements during the 7.28.17 Conference Call concerning the growth in inventories were false and misleading. Inventories had not grown due to inflation and building the business, so much as Defendants' scheme. In truth, the rise in inventories was attributable to the Company storing millions of square feet of carpet and LVT in inventory that was unsaleable and/or there was no customer demand for, and which should have been written down in value but was not. *See* § V.E..

201.   After the Company issued the 7.27.17 Press Release, on November 3, 2017 the Company filed its Form 10-Q Quarterly Report with the SEC (the "2Q2017 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 2Q2017 Form 10-Q repeated the same false financial results reported in the 7.27.17 Press Release indicated above, and is false for the same reasons.

202.   The 2Q2017 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

The increase in diluted EPS for the three and six months ended July 1, 2017 was primarily attributable to increased sales volumes, savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, lower interest rates and the favorable impact of foreign exchange rates on transactions, partially offset by higher input costs, increased employee costs, costs associated with investments in new product development, sales personnel, and marketing, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs.

203. Similarly, the 2Q2017 Form 10-Q attributed Mohawk's operating income to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

Operating income for the three months ended July 1, 2017 was $355.8 million (14.5% of net sales) reflecting an increase of $5.1 million, or 1.5%, compared to operating income of $350.7 million (15.2% of net sales) for the three months ended July 2, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $44 million, the favorable net impact of price and product mix of approximately $38 million, and increased sales volume of approximately $13 million, partially offset by higher input costs of approximately $58 million, including increased material costs of approximately $41 million, approximately $7 million of costs associated with investments in new product development, sales personnel, and marketing, the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $19 million, the net impact of unfavorable foreign exchange rates of approximately $2 million, and investments in expansion of production capacity of approximately $3 million.

204. Defendants made similarly misleading statements in the 2Q2017 Form 10-Q attributing the Company's increase in operating earnings at the Flooring North America segment to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

*Flooring NA segment* – Operating income was $127.5 million (12.3% of segment net sales) for the three months ended July 1, 2017 reflecting an increase of $8.5 million compared to operating income of $118.9 million (12.1% of segment net sales) for the three months ended July 2, 2016. The increase in operating income was primarily attributable to the favorable net impact of price and product mix of approximately $20 million, savings from capital investments and cost reduction initiatives of approximately $12 million, and increased sales volumes of approximately $6 million, partially offset by higher input costs of approximately $22 million, including increased material costs of approximately $17 million, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $6 million.

205. Defendants' statements in the 2Q2017 Form 10-Q concerning the increase in earnings and operating income were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS. *See* §§ V.D., V.E., and V.F.

206.   In the 2Q2017 Form 10-Q, Defendants also falsely assured investors the Company was preparing for the adoption of Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers, by analyzing Mohawk's compliance with the ASC 606 standards. The 2Q2017 misleadingly assured investors the Company was in compliance with the revenue recognition rule:

> The Company continues to analyze the adoption of ASC 606, including certain contracts that could result in a change in the timing of the recognition of revenue, the identification of new controls and processes designed to meet the requirements of the standard, and the required new disclosures upon adoption. ***At this time ASC 606 is not expected to have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows.***

207.   In truth, as detailed above at § V.F., the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of both then-existing applicable accounting rules and ASC 606.

208.   The 2Q2017 Form 10-Q also falsely assured investors the Company's inventory levels were properly accounted for:

> In July 2015, the FASB issued ASU 2015-11, Simplifying the Measurement of Inventory. This update changes the measurement principle for inventory for entities using FIFO or average cost from the lower of cost or market to lower of cost and net realizable value. . . .

*The Company adopted the provisions of this update at the beginning of fiscal year 2017. This update did not have a material impact on the Company's consolidated financial statements.*

209.   In truth, as detailed above at § V.E., the Company carried in its inventory material amounts of defective and unsellable LVT and carpeting that had not been marked down to the lower of cost and net realizable value.

**D.    Third Quarter 2017**

210.   On October 26, 2017, Mohawk issued a press release and filed it with the SEC (the "10.26.17 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 third quarter, net earnings of $270 million and diluted earnings per share (EPS) of $3.61. Adjusted net earnings were $281 million and EPS was $3.75, excluding restructuring, acquisition and other charges, a 7% increase over last year. Net sales for the third quarter of 2017 were $2.4 billion, up 7% in the quarter and 5% on a constant days and currency basis. . . .
>
> For the nine months ending September 30, 2017, net earnings and EPS were $731 million and $9.77, respectively. Adjusted net earnings and EPS were $763 million and $10.19, excluding restructuring, acquisition and other charges, a 9% increase over last year. For the nine-month period, net sales were $7.1 billion, an increase of 5% and 5.5% on a constant days and currency basis. . . .

Commenting on Mohawk Industries' third quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "During the period, Mohawk delivered **record adjusted earnings and EPS**, with sales growing approximately 7%. . . . Our many operational and process improvements resulted in productivity gains of approximately $49 million . . . ."

211. The 10.26.17 Press Release continued:

"During the quarter, our Flooring North America Segment's sales increased 2% as reported. The segment's price, mix and ***productivity improved significantly*** during the period, covering increases in raw materials and other inflation. Our new product introductions improved our average selling prices and margins, and our process innovations and investments in manufacturing technology improved our costs. The hurricanes in Texas and Florida interrupted normal purchasing patterns and impacted our sales during the period. . . . ***We have enhanced the productivity of our U.S. LVT operations***, and we are expanding our product offering in both the residential and commercial categories. We have introduced a proprietary rigid LVT collection designed for exceptional stability and durability as we prepare for our new U.S. LVT production in the second quarter of next year."

212. Defendants' statements in the 10.26.17 Press Release were false and misleading for the following reasons: (i) Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS; and, (ii)

Mohawk's U.S. LVT operations were plagued by production problems causing over half of the LVT to be defective, and any assurance of "enhanced . . . productivity" was misleading without a disclosure concerning the ongoing production problems. *See* § V.D., V.E., and V.F.

213.   After the Company issued the 10.26.17 Press Release, Mohawk held a conference call for investors on October 27, 2017 (the "10.27.17 Conference Call"). During the 10.27.17 Conference Call, Defendants asserted Mohawk was capacity constrained – demand for its LVT and carpet products was higher than the Company's manufacturing ability. Chris Wellborn, Mohawk's President and Chief Operating Officer, with the approval of the Defendants, stated: "Capacity limitations in laminate, LVT and some residential carpet categories constrained our sales during the period and will be addressed in the fourth quarter." Later in the call, Defendant Lorberbaum answered a question about what Mohawk meant by capacity constrained. Lorberbaum stated "we increased the capacity of our LVT through productivity initiatives[,] *we were selling all of that we could have*."

214.   Defendants boasted of the Company's U.S. based LVT production capabilities, without any hint of the problems the Company was dealing with. With the approval of Defendants, Wellborn stated: "We have enhanced the productivity

of our U.S. LVT operations and we are expanding our product offering in both residential and commercial categories. We introduced a proprietary rigid LVT collection designed for exceptional stability and durability as we prepare for new U.S. LVT production in the second quarter next year."

215.   Concerning the growing LVT market, Defendant Lorberbaum assured investors "the U.S. is a head [sic] of the rest of the world in the use of the LVT. . . . [W]e think we're putting ourselves in the best position by having the lowest cost and largest capacity in the U.S. to support it [the growing sales of LVT.]"

216.   Defendants' statements concerning LVT during the 10.27.17 Conference Call were false and misleading for the following reasons: (i) As CW6 confirmed, Mohawk was not capacity constrained. Mohawk was able to produce excess amounts of *defective* and *unsaleable* LVT, such that Mohawk had stored millions of square feet of LVT in warehouses indefinitely. *See* ¶¶ 83-86. (ii) Further, Mohawk's purported "enhanced . . . productivity" of its U.S. LVT operations had *not* put Mohawk in "the best position" to capture the growing LVT market as Mohawk's U.S. LVT production continued to be plagued by manufacturing problems causing over 50% of the LVT produced to be defective. *See* § V.D.

217.   During the Third Quarter 2017 Investor Call, Defendants also represented that the Company's rising inventory and slowing inventory turnover were attributable to "raw material inflation and source product growth." Specifically, Mohawk's CFO, with the approval of all Defendants, stated: "Our inventories ended the quarter at $1,911,000,000. We had 112 days of inventory on hand, with raw material inflation and source product growth impacting the days."

218.   Defendants' statements in the 10.27.17 Conference Call regarding the cause of rising inventory levels were false and misleading. Growing inventory levels were not due to "raw material inflation and source product growth" – but to Defendants' refusal to write down the value of millions of square feet of defective and unsaleable carpet and LVT. *See* § V.E.

219.   After the Company issued the 10.26.17 Press Release, on November 3, 2017 the Company filed its Form 10-Q Quarterly Report with the SEC (the "3Q2017 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 3Q2017 Form 10-Q repeated the same false financial results reported in the 10.26.17 Press Release indicated above, and is false for the same reasons.

220.   The 3Q2017 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> The increase in diluted EPS for the nine months ended September 30, 2017 was primarily attributable to savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, and lower interest rates, partially offset by higher input costs, increased employee costs, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs.

221.   Defendants made similarly misleading statements in the 3Q2017 Form 10-Q attributing the Company's increase in operating earnings to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Operating income for the three months ended September 30, 2017 was $380.1 million (15.5% of net sales) reflecting an increase of $1.8 million, or 0.5%, compared to operating income of $378.3 million (16.5% of net sales) for the three months ended October 1, 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $49 million, the favorable net impact of price and product mix of approximately $62 million, and the net impact of favorable exchange rates of approximately $4 million, partially offset by higher input costs of approximately $61 million, including increased material costs of approximately $47 million, approximately $6 million of costs associated with investments in new product development, sales personnel, and marketing, the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $29 million, decreased sales volumes of approximately

$9 million, primarily attributable to lower patent revenue, increased employee costs of approximately $4 million, and costs associated with investments in expansion of production capacity of approximately $3 million.

222.   Defendants made similarly misleading statements in the 3Q2017 Form 10-Q attributing the changes in the Flooring North America segment operating earnings to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> *Flooring NA segment* - Operating income was $163.5 million (15.8% of segment net sales) for the three months ended September 30, 2017 reflecting a decrease of $7.0 million compared to operating income of $170.5 million (16.9% of segment net sales) for the three months ended October 1, 2016. The decrease in operating income was primarily attributable to the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $25 million. Restructuring, acquisition and integration-related, and other costs were higher primarily due to the absence of approximately $90 million received related to a contract dispute, partially offset by the approximately $48 million charge related to the write-off of the Lees tradename that were recorded in the prior year. Also contributing to the change in operating income were the favorable net impact of price and product mix of approximately $32 million and savings from capital investments and cost reduction initiatives of approximately $25 million, partially offset by higher input costs of approximately $29 million, including increased material costs of approximately $24 million, and a decrease in sales volumes of approximately $4 million.

223.   Defendants' statements in the 3Q2017 Form 10-Q concerning the changes in earnings and operating income were false and misleading because

Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS. *See* §§ V.D., V.E., and V.F.

224.   In the 3Q2017 Form 10-Q, Defendants also falsely assured investors the Company was preparing for the adoption of Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers, by analyzing Mohawk's compliance with the ASC 606 standards. The 3Q2017 misleadingly assured investors the Company was in compliance with the revenue recognition rule: "***At this time ASC 606 is not expected to have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows.***" In truth, as detailed above at § V.F., the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of applicable accounting rules and ASC 606.

225.   The 3Q2017 Form 10-Q also falsely assured investors the Company's inventory levels were properly accounted for:

In July 2015, the FASB issued ASU 2015-11, *Simplifying the Measurement of Inventory*. This update changes the measurement principle for inventory for entities using FIFO or average cost from the lower of cost or market to lower of cost and net realizable value. . . . ***The Company adopted the provisions of this update at the beginning of fiscal year 2017***. ***This update did not have a material impact on the Company's consolidated financial statements***.

226.   In truth, as detailed above at §§ V.D and V.E., the Company carried in its inventory material amounts of defective and unsellable LVT and carpeting that had not been marked down to the lower of cost and net realizable value.

**E.     Fourth Quarter and Full-Year 2017**

227.   On February 8, 2018, Mohawk issued a press release and filed it with the SEC (the "2.8.18 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

Mohawk Industries, Inc. (NYSE: MHK) today announced 2017 fourth quarter net earnings of $240 million and diluted earnings per share (EPS) of $3.21. Adjusted net earnings were $256 million and EPS was $3.42, excluding restructuring, acquisition and other charges, a 5% increase over last year. Net sales for the fourth quarter of 2017 were $2.4 billion, up 8.5% in the quarter and 6% on a constant days and currency basis. . . .

For the year ended December 31, 2017, net earnings and EPS were $972 million and $12.98, respectively. Adjusted net earnings and

EPS were $1,019 million and $13.61, excluding restructuring, acquisition and other charges, an 8% increase over last year. For the year ended December 31, 2017, net sales were $9.5 billion, an increase of 6% as reported and on a constant days and currency basis. . . .

Commenting on Mohawk Industries' fourth quarter and full-year performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "In 2017, our strong organization and long-term strategies allowed Mohawk to deliver *record-breaking results*. For the full year, we generated operating income of $1.4 billion, up 6% as reported and 9% excluding restructuring, acquisition and other charges, and our EBITDA rose to $1.8 billion, both records. *Our recurring business income grew at a much higher rate in 2017* when excluding the expired patent income and incremental start-up investments. During the year, we identified opportunities for growing our business, differentiating our products and improving our productivity, which we supported with over $900 million in internal investments, the highest in company history.

228.   The 2.8.18 Press Release continued, quoting Defendant Lorberbaum:

"During the quarter, our Flooring North America Segment's sales increased 3% as reported. The segment's margins increased approximately 130 basis points as reported . . . . We are expanding our rigid and flexible LVT offerings with specific products tailored for each of the residential, do-it-yourself, apartment and commercial markets. During the quarter, we increased our marketing investments in LVT to expand our sales in anticipation of our new manufacturing line, which will begin production in the second quarter."

229.   Defendants' statements in the 2.8.18 Press Release were false and misleading for the following reasons: (i) Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated

by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS; and, (ii) Mohawk's U.S. LVT operations were plagued by production problems causing over half of the LVT to be defective, and any discussion of "expanding . . . LVT offerings" was misleading without a disclosure concerning the ongoing production problems. *See* §§ V.D., V.E., and V.F.

230.   After the Company issued the 2.8.18 Press Release, Mohawk held a conference call for investors on February 9, 2018 (the "2.9.18 Conference Call"). During the 2.9.18 Conference Call, Defendant Lorberbaum misleadingly asserted the North American Flooring segment had achieved excellent financial results attributed to the sales of LVT and carpet: "In the Flooring North America segment sales were $999 million, a 3% increase. We had good growth in both LVT and in Carpet. Our operating margin excluding charges was 16.7%. It improved 160 basis points as positive price mix of $21 million and productivity of $22 million offset $20 million of inflation."

231.   Mohawk's CFO Frank Boykin also misleadingly attributed the cause of rising inventory levels to benign factors: "Our inventories were $1.949 billion

with inventories at 119 days. Inventories have been impacted by higher raw material cost, ramp up of new products and backwards integration. We anticipate lowering our inventory next year."

232.   Lorberbaum misleadingly attributed Mohawk's increase in sales and earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Over the past three years, our strategies of adding new products, increasing our capacities and acquiring new businesses have led to an expanded earnings even as income from our Click patent expired. Our 2017 results reflected the impact of these strategies including 34 million of start-up costs to ramp up new products and production and significant increases in raw materials.

233.   Defendant Lorberbaum also assured investors the Company's expansion into LVT production was going well, stating "we're the largest manufacturer of LVT. We're putting on much more. We have a significant head start of anybody in making low-cost automated LVT in the world, and we think we're well-positioned." He further stated: "LVT as a product coming into the marketplace has grown faster than anything that I've seen in my 40 years of history. . . . *We're at the forefront of making highly-automated low-cost production on a local basis which nobody else has like we do and it's going to advantage us long-term*, however in the short-term it's impacted our speed-to-market of new

introductions because we're going through the learning curves but *we're way ahead of everybody else*."

234. The statements in the 2.9.18 Conference Call were false and misleading for the following reasons: (i) By partially attributing sales growth in the North American Flooring Segment to growing sales of LVT, Defendants were obligated to disclose the North American Flooring Segment both increased revenues by pulling in sales from future quarters and the production of LVT was hampered by production problems such that most of the LVT product was defective and unsaleable, (*see* §§ V.D. and V.F.); (ii) Margins of 16.7% had been improperly inflated by running production lines in excess of customer demand, and refusing to write down the excess LVT and carpet sitting in inventory, (*see* § V.E.); (iii) Mohawk's "expanded earnings" were due to the schemes alleged herein, and not to the growth "strategies" Defendants described, (*see* §§ V.D., V.E., and V.F.); and (iv) Mohawk's "significant head start" in the production of LVT, and other positive superlatives, were severely and negatively impacted by the Company's inability to produce "first grade" LVT that consumers would purchase, (*see* § V.D.).

235. After the Company issued the 2.8.18 Press Release, on February 28, 2018 the Company filed its Form 10-K with the SEC (the "2017 Form 10-K"),

which was approved by and/or made on the basis of information provided by the Individual Defendants. The 2017 Form 10-K repeated the same false financial results reported in the 2.8.18 Press Release indicated above. The 2017 Form 10-K also falsely reported that "[n]et sales for 2017 were $9,491.3 million, reflecting an increase of $532.2 million, or 5.9%" and that, for Flooring North America, "[n]et sales increased $145.1 million, or 3.8%, to $4,010.9 million for 2017, compared to $3,865.7 million for 2016." The financials in the 2017 Form 10-K were false and misleading for the same reasons set forth with respect to the 2.8.18 Press Release.

236.   The 2017 Form 10-K also misleadingly attributed Mohawk's increased earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories: "The increase in EPS was primarily attributable to savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, and lower interest rates, partially offset by higher input costs, increased employee costs, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs."

237.   Defendants made similarly misleading statements in the 2017 Form 10-K attributing the Company's increase in operating earnings to legitimate causes,

without mention of the Company's manipulation of revenues, earnings, and inventories:

> Operating income for 2017 was $1,354.2 million (14.3% of net sales) reflecting an increase of $74.2 million, or 5.8%, compared to operating income of $1,279.9 million (14.3% of net sales) for 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $178 million and the favorable net impact of price and product mix of approximately $169 million, partially offset by higher input costs of approximately $195 million, including increased material costs of approximately $137 million, approximately $23 million of costs associated with investments in new product development, sales personnel, and marketing, increased employee costs of approximately $13 million, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs of approximately $45 million.

238.   Defendants made similarly misleading statements in the 2017 Form 10-K attributing the increase in the Flooring North America segment operating earnings to legitimate causes, without mention of the Company's manipulation of revenues, earnings, and inventories:

> *Flooring NA Segment*—Operating income was $540.3 million (13.5% of segment net sales) for 2017 reflecting an increase of $35.2 million, or 7.0%, compared to operating income of $505.1 million (13.1% of segment net sales) for 2016. The increase in operating income was primarily attributable to savings from capital investments and cost reduction initiatives of approximately $71 million, and the favorable net impact of price and product mix of approximately $74 million, partially offset by higher input costs of approximately $72 million, including increased material costs of approximately $54 million, and the unfavorable impact of higher

- 102 -

restructuring, acquisition and integration-related, and other costs of approximately $33 million.

239.  Defendants' statements in the 2017 Form 10-K concerning the cause of increased earnings and income were false and misleading for the reasons outlined in §§ V.D. and V.E.

240.  In addition, the 2017 Form 10-K falsely stated: "Revenues are recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price has been fixed or is determinable, and collectability can be reasonably assured." In truth, as detailed above at § V.F., the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers.

241.  The 2017 Form 10-K also falsely stated: "Inventories are stated at the lower of cost or market (net realizable value)." In truth, as detailed above at § V.E., the Company carried in its inventory material amounts of defective LVT and carpeting that had not been marked down to the lower of cost or market (net realizable value).

242.  At or about the same time the Company issued its 2017 Form 10-K, the Company issued its 2017 Annual Report to Shareholders (the "2017 Annual

Report") that was posted to the Company's website (where it remained through, at a minimum, March 2021). In the 2017 Annual Report, Defendant Lorberbaum misleadingly wrote in his letter to shareholders:

> *We began 2017 with Mohawk in the best position in its history and concluded the year even stronger*. For the second consecutive year, Mohawk generated record revenue, operating income and EBITDA — all while supporting new growth opportunities through $900 million in internal investments, also a record level. That performance reflects both the effective execution of *our long-term strategy* and the strength of our organization.

243. Defendant Lorberbaum's letter also highlighted that Mohawk was supposedly "capitalizing on the accelerating popularity of luxury vinyl tile (LVT) by expanding residential and commercial distribution in the U.S. and Europe."

244. Further still, Defendant Lorberbaum misleadingly claimed the Company's acquisition of IVC had been an exemplar of success:

> The common thread across these initiatives is the ability to leverage the strengths of one business into another. Consider IVC, which we acquired in 2015 to enter the LVT category. Already the LVT market leader in Europe, IVC was quickly positioned to capitalize on the explosive growth in the U.S. by exploiting Mohawk's extensive customer relationships, marketing expertise and distribution channels in North America. . . . In each case, we're able to grow our business in capital-efficient ways to maximize returns.

245. Defendants' statements in the 2017 Annual Report were false and misleading for the following reasons: (i) the contention that Mohawk was "even

stronger" than early 2017 when the Company was in the "best position in its history" – or that Mohawk was effectively executing on its "long-term strategy" – were materially misleading in light of Defendants' various schemes to meet short term analyst financial expectations, as detailed herein §§ V.D., V.E, and V.F.; (ii) Mohawk was not effectively "capitalizing on the accelerating popularity of luxury vinyl tile" but had bungled its efforts to grow market share in LVT by failing to fix problems in its U.S. LVT Plant, (*see* § V.D.); and (iii) Mohawk's acquisition of IVC had not been an exemplar of success, as the U.S. LVT Plant acquired by Mohawk in the IVC transaction was riddled with production problems, (*see* § V.D.).

### F.    First Quarter 2018

246.    On April 26, 2018, Mohawk issued a press release and filed it with the SEC (the "4.26.18 Press Release"), which had been approved by and/or otherwise made on the basis of information provided by the Individual Defendants, reading:

> Mohawk Industries, Inc. (NYSE: MHK) today announced 2018 first quarter net earnings of $209 million and diluted earnings per share (EPS) of $2.78. Adjusted net earnings were $225 million and EPS was $3.01, excluding restructuring, acquisition and other charges, an 11% increase over last year. Net sales for the first quarter of 2018 were $2.4 billion, up 9% in the quarter and 4% on a constant currency basis. . . .

> Commenting on Mohawk Industries' first quarter performance, Jeffrey S. Lorberbaum, Chairman and CEO, stated, "Mohawk is benefiting from its diverse geographical footprint and product portfolio.

***Our performance in the first quarter accentuated this strength as we realized significant growth in LVT in our largest markets*** and sales and profits grew strongly in our ceramic business outside the U.S."

247.   Defendants' statements in the 4.26.18 Press Release were false and misleading because Mohawk's publicly reported financial results – including earnings, revenues, and margins – had been artificially inflated by Defendants' schemes to pull in sales from future periods, refusal to write down defective and/or excess LVT and carpet in inventory, and the overproduction of LVT and carpet (beyond what Mohawk could sell) to drive down COGS. *See* §§ V.D., V.E., and V.F.

248.   After the Company issued the 4.26.18 Press Release, Mohawk held a conference call for investors on April 27, 2018 (the "4.27.18 Conference Call"). During the 4.27.18 Conference Call, Defendants repeated the financial results published in the 4.26.18 press release, which were false and misleading for the same reasons.

249.   Defendant Lorberbaum boasted about Mohawk's LVT business in the United States. Regarding LVT, he stated Mohawk's "strategy[,] unlike others, of having low-cost, high volume capacity gives [Mohawk] competitive advantages." Lorberbaum concealed and failed to disclose that Mohawk's U.S. LVT production

was plagued by defects so severe that the majority of the product was unsellable, the disclosure of which was necessary to make his statements not misleading to investors. *See* § V.D.

250.   In addition, Defendants reiterated that Mohawk's sales of LVT were capacity constrained – demand for Mohawk's LVT products was higher than the Company's manufacturing ability. During the call, Chris Wellborn, Mohawk's President and Chief Operating Officer, with the approval of the Defendants, stated: "So our ongoing business had good growth with LVT and wood panels performing the best. Our LVT was constrained in the period and the new production will increase sales and add new products." As CW6 confirmed, Mohawk was not capacity constrained. Mohawk was able to produce excess amounts of *defective* and *unsaleable* LVT, such that Mohawk had stored millions of square feet of LVT in warehouses indefinitely. *See* ¶¶ 83-86.

251.   During the 4.27.18 Conference Call, Defendants also represented that the Company's rising inventories and slow inventory turnover were attributable to "increasing inflation and our backwards integration." Mohawk's CFO, with the approval of all Defendants stated: "Inventories were $2,045 million with inventory days at 116 days, which improved over the fourth quarter. Inventory turns continue

to be impacted by increasing inflation and our backwards integration." In truth, Defendants had purposefully grown the Company's inventories to lower COGS and inflate margins and earnings, and refused to write down defective and unsaleable carpet and LVT. *See* §§ V.D. and V.E.

252. After the Company issued the 4.26.18 Press Release, on May 4, 2018 the Company filed its Form 10-Q Quarterly Report with the SEC (the "1Q2018 Form 10-Q"), which was approved by and/or made on the basis of information provided by the Individual Defendants. The 1Q2018 Form 10-Q repeated the same false financial results reported in the 4.26.18 Press Release indicated above. The financials in the 1Q2018 Form 10-Q were false and misleading for the same reasons set forth with respect to the 4.26.18 Press Release.

253. The 1Q2018 Form 10-Q misleadingly attributed Mohawk's increase in earnings to legitimate business factors, without mention of the Company's manipulation of revenues, earnings, and inventories:

> Net earnings attributable to the Company were $208.8 million, or diluted EPS of $2.78 for 2018 compared to net earnings attributable to the Company of $200.6 million, or diluted EPS of $2.68 for 2017. The increase in EPS was primarily attributable to savings from capital investments and cost reduction initiatives, the favorable net impact of price and product mix, and the decrease in income tax expense due to the lower effective tax rate as a result of the recent reforms in the U.S. and Belgium, partially offset by

higher inflation costs, and the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs.

254.  In truth, as detailed above at §§ V.E. and V.F., the Company had increased EPS by, in part, pulling in sales from future periods by channel stuffing and the Saturday Scheme, overproducing product to drive down COGS, and refusing to write down defective inventory. Had Mohawk properly accounted for revenues and inventory, it would not have achieved the net earnings gains it boasted of.

255.  Defendants also made similarly misleading statements in the 1Q2018 Form 10-Q regarding the Company's operating earnings at the parent company and the Flooring North America segment.

> Operating income for the three months ended March 31, 2018 was $268.4 million (11.1% of net sales) reflecting a decrease of $6.4 million, or 2.3%, compared to operating income of $274.8 million (12.4% of net sales) for the three months ended April 1, 2017. The decrease in operating income was primarily attributable to higher inflation costs of approximately $52 million, including increased material costs of approximately $34 million, approximately $19 million due to the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs, and approximately $9 million of startup costs associated with large in investments to expand sales, add product categories, and enter new markets, partially offset by the favorable net impact of price and product mix of approximately $38 million, savings from capital investments and cost reduction initiatives of approximately $31 million, and the net impact of favorable exchange rates of approximately $8 million.

* * *

*Flooring NA segment* – Operating income was $74.7 million (7.9% of segment net sales) for the three months ended March 31, 2018 reflecting a decrease of $17.4 million compared to operating income of $92.1 million (9.8% of segment net sales) for the three months ended April 1, 2017. The decrease in operating income was primarily attributable to higher inflation costs of approximately $25 million, including increased material costs of approximately $20 million, and approximately $14 million due to the unfavorable impact of higher restructuring, acquisition and integration-related, and other costs, partially offset by the favorable net impact of price and product mix of approximately $14 million and savings from capital investments and cost reduction initiatives of approximately $13 million.

256.   Operating income year-over-year had declined. Defendants misled investors as to the true size of the decline in operating earnings by pulling in future sales and refusing to write down defective inventory. Further, Defendants misled investors as to the causes of declining operating income by not revealing that the Company had (i) manipulated revenues by pulling in sales and the Saturday Scheme, and (ii) produced defective LVT and excess carpet, which was carried as inventory without being properly marked down, as detailed herein at §§ V.E. and V.F. By the first quarter of 2018, these practices had created a deep hole the Company could not get out of, thus hampering Mohawk's ability to continue to grow operating income and meet operating income targets for the first quarter of 2018.

257.   In the 1Q2018 form 10-Q, Defendants also falsely assured investors the Company had successfully reviewed and adopted new standards for the recognition of revenue:

> On January 1, 2018, the Company adopted the new accounting standard, ASC 606, Revenue from Contracts with Customers and all the related amendments ("ASC 606") and applied the provisions of the standard to all contracts using the modified retrospective method. The cumulative effect of adopting the new revenue standard was immaterial and no adjustment has been recorded to the opening balance of retained earnings. . . .
>
> . . . The Company reviewed all of its revenue product categories under ASC 606 and the only changes identified were . . . immaterial . . . . The adoption of ASC 606 did not have a material impact on the amounts reported in the Company's consolidated financial position, results of operations or cash flows.

258.   In truth, as detailed above at § V.F., the Company recognized revenue on product shipped prematurely and without the customers' consent (*i.e.*, without the existence of an arrangement), and which oftentimes was not delivered but returned to the Company's distribution centers, in violation of applicable accounting rules and ASC 606.

## VIII.  LOSS CAUSATION

259.   Plaintiffs incorporate by reference §§ V.G. and V.H, as if fully set forth herein.

260.   The price of Mohawk common shares purchased by Plaintiffs was artificially inflated by the material misstatements and omissions alleged herein, including the false and misleading statements regarding Mohawk's revenues, earnings, inventories, and LVT quality and sales. *See* § VII.

261.   Defendants had repeatedly lied about Mohawk's true financial condition throughout 2017 and early 2018.

262.   Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the relevant period, Plaintiffs would not have purchased Mohawk's securities or would not have purchased Mohawk securities at the artificially inflated prices that they paid.

263.   After the second quarter of 2018, Mohawk was forced to disclose that Mohawk's true financial condition was not nearly as good as Defendants had previously told investors.

264.   As a result, on July 26, 2018, the price for Mohawk's publicly traded shares declined by $38.06 per share on heavy volume, representing a fall of 18% and erasing over $2.7 billion of shareholder market capital.

265.   Plaintiffs collectively held over 1.4 million shares of Mohawk stock on July 26, 2018, which Plaintiffs had purchased between January 2018 and July

2018, at prices significantly above their true value and significantly above the price at closing on July 26, 2018, after the Company's true financial condition was partially revealed to investors.

266. Mohawk's true financial condition, which Defendants had misrepresented, was disclosed in a series of partial disclosures as alleged herein at §§ V.E. and V.F.

267. It was foreseeable that, after Defendants' fraudulent scheme and misleading statements caused Mohawk's stock price to trade at artificially inflated prices, Mohawk's stock price would decline when the Company's true financial condition was revealed to investors. It was also foreseeable that such a decline in the stock price would harm Plaintiffs.

268. As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct alleged herein, Plaintiffs purchased Mohawk common stock at prices far exceeding its true worth. Mohawk shareholders, including Plaintiffs, were injured when the scheme was partially revealed by Mohawk's failure to be able to maintain the unsustainable practice of pulling in future sales and hiding an ever-more increasing level of inventory of defective LVT (and other products).

269.   The partial disclosures reduced the amount of inflation in the price of Mohawk's stock when they were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized. Plaintiffs were damaged as a result.

270.   The timing and magnitude of the declines in Mohawk's share price negate any inference that Plaintiffs' losses were caused by some other intervening event unrelated to Defendants' false and misleading statements, such as changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

271.   Defendants participated in a scheme to defraud investors, including Plaintiffs, by issuing false and misleading statements about Mohawk's true financial condition, including Mohawk's earnings, revenues, inventories, and LVT quality and sales.

272.   As alleged herein, former employees detail how Mohawk and the Individual Defendants (i) knew Mohawk had a problem with defective LVT that was unsellable, which was either sold by fraud or stored indefinitely as scrap that should have been written off (*see* §§ V.D.); (ii) knew Mohawk purposefully

manipulated earnings and revenues by pulling in future sales, including through the Saturday Scheme, to meet quarterly earnings estimates (*see* § V.F.); and (iii) intentionally drove down COGS by producing more carpet and defective LVT than Mohawk could sell, to misleadingly boost margins and earnings (*see* § V.E.).

273.   Accordingly, Defendants' false and misleading statements to investors were made with an intent to deceive investors. A strong inference of Defendants' scienter is supported by the following factors.

### A.   The Flooring North America Segment – Under the Direction of Defendant Carson – Orchestrated the Fraudulent Scheme

274.   All of the deceptive practices to manipulate Mohawk's reported financial results as described herein – (i) pulling in forward sales and the Saturday Scheme, (ii) concealment of defective LVT, and (iii) inventory manipulation – were concentrated in Mohawk's Flooring North America Segment, under the direction of Defendant Carson.

275.   Defendant Carson reported directly to Defendant Lorberbaum, was one of the Company's eight executive officers, and was a member of the Company's world-wide leadership team.

**B.    Mohawk Did Exactly What Defendants Said Mohawk
Would Not Do**

276.    In February 2017, Mohawk published its Annual Report to Shareholders for 2016 (the "2016 Annual Report"). In the 2016 Annual Report, Defendants misleadingly told investors: "While some public companies focus on meeting quarterly expectations or maximizing results in a given year, we focus on building a company that will last forever. It's a philosophy that has served our shareholders well, as Mohawk has outperformed the market for more than two decades."

277.    Defendants' statement was directly at odds with the quarterly earnings manipulations Defendants engaged in via (i) the pulling in of sales, including the Saturday Scheme, to manipulate the quarterly earnings to meet quarterly expectations, (ii) Mohawk's sales of defective LVT to customers just to meet quarterly earnings, and (iii) the production of excess LVT and carpet – to sit in warehouses – for the sole purpose of making the Company's margins look better to investors.

278.    The fact that Defendants' actions so deviated from their statements to investors supports a strong inference Defendants acted with an intent to deceive investors.

**C.      Problems at the U.S. LVT Plant Were Well Known to
Executives Within Mohawk**

279.   Many former employees, as detailed herein, reported that the problem of defective LVT was widely known within Mohawk. For instance, CW4 said that upper management knew about the defective LVT and pressured lower-level employees to work through un-safe working conditions to figure out how to fix it – leading to the human resources department becoming involved in the situation.

280.   Similarly, CW5 described the LVT problems as widely known, noting "there was a lot of pressure to fix it." Further, according to CW5, the defective LVT was discussed in monthly business meetings attended by Company leadership and executives, during which executives reviewed and discussed reports showing increasing scrap LVT.

**D.      A Senior Mohawk Employee Warned Defendant Carson of
the Defective LVT in 2017**

281.   FE11 personally studied the defective LVT production at the Company's U.S. LVT Plant. In 2017, FE11 personally told Defendant Carson that Mohawk's competitors made better product and Mohawk should import LVT, rather than make it in the U.S. LVT Plant, because of the defects in the LVT

Mohawk produced. The U.S. LVT Plant was, according to FE11, incapable of producing good LVT.

### E.     The Scale of the Defective LVT Problem was Massive and Obvious

282.    Defendants were clearly on notice about the massive defective LVT problem given its size and scope. As described by CW6, the surplus LVT storage situation was "insane." LVT inventory grew from 36 million square feet to 90 million square feet. In 2017 and 2018, the GHB distribution center spent $5 million to outfit its space to accommodate defective LVT and, in addition, the Company filled at least 100 empty trailers with scrap LVT. The problem got so bad Mohawk rented hundreds of thousands of square feet of storage space just to store defective LVT it could not sell – despite all the while telling investors Mohawk was "capacity constrained" and able to sell all the LVT it manufactured.

283.    As CW7 put it, Mohawk had "buildings and buildings" worth of defective LVT that it was trying to sell for "pennies on the dollar by the truckload."

### F.     Mohawk Created the G3 Team to Study Lagging LVT Sales

284.    According to CW1, Mohawk created the "G3 Team" to meet weekly and specifically analyze why Mohawk's LVT's sales were lagging expectations.

285.   CW1 reported that the G3 Team uncovered that the Company had been purposefully shipping defective LVT – that Mohawk knew would be returned – to meet quarterly earnings estimates.

### G.   Mohawk Installed Defective LVT at its Headquarters Where the Individual Defendants Worked

286.   According to CW1, when the Individual Defendants went to work, they walked on Mohawk's own LVT, which would not lay flat and all peeled back up.

### H.   Major Customers, Including Home Depot, Told Mohawk Senior Executives its LVT was Defective

287.   Mohawk's customers told Mohawk its LVT was defective.

288.   For instance, Mohawk met with Home Depot quarterly to review their business relationship. As detailed by CW1, Home Depot was consistently frustrated by Mohawk's inability to ship good quality LVT. These meetings were attended by high-level Mohawk executives, including Mohawk's general counsel and Senior Vice President over distribution.

289.   CW3 corroborates this, indicating Mohawk lost business with a number of customers because it shipped these customers defective LVT falsely labeled "first quality."

290.   Similarly, according to CW8, smaller flooring companies (not big box retailers) also complained to Mohawk and its distributors about the LVT defects. As CW8 put it, "It was a nightmare for quite a while."

### I.     The Individual Defendants Were Focused on LVT Production

291.   FE11 indicates Carson and Lorberbaum were keenly focused on the U.S. LVT Plant, as Mohawk had spent $1.2 billion to acquire it.

292.   Lorberbaum was focused on LVT production so much that, in an effort to fix the LVT production problems, Lorberbaum changed FE11's boss – the person overseeing the U.S. LVT Plant – five times in two years.

293.   Lorberbaum's statements to the public concerning LVT further highlight he was focused on this area of the business. Defendant Lorberbaum regularly commented on, and answered analysts' questions concerning, LVT. For instance, in the 2016 Annual Report (published February 2017), Defendant Lorberbaum wrote in his letter to shareholders: "A particular area of focus is luxury vinyl tile (LVT), one of the flooring industry's newest and fastest-growing products. . . . LVT represents a major growth opportunity for Mohawk."

**J.    Lorberbaum Approved the Sale of Defective LVT For Pennies on the Dollar**

294.   In 2017 and early 2018, Mohawk sold one million square feet of defective LVT for only $0.99 per square foot, versus the standard price of $2.50. Mohawk told investors the product was first quality. CW2 said the sales were "dishonest, shady dealing" and Mohawk had "Enron scandal written all over it."

295.   The sale of such a large amount of LVT, at such a large discount, meant two things according to CW2: (i) the sale was approved by Mohawk CEO Lorberbaum, and (ii) Lorberbaum knew the LVT was defective, therefore justifying the large discount.

**K.    Inventory Reports Showed Mohawk's LVT Sales Were NOT Capacity Constrained, and that Mohawk's Over-Production of LVT and Carpet was Intended to Manipulate its Reported Financial Results**

296.   According to numerous former employees, Mohawk stored in inventory massive amounts of defective LVT.

297.   Defendants said Mohawk was "capacity constrained" – selling all of the LVT it could make.

298.   According to CW6, Mohawk created weekly inventory reports showing that Mohawk carried in its inventory massive amounts of LVT. These

weekly inventory reports were provided to Mohawk's senior management every Monday morning.

299.   If Mohawk had in fact been capacity constrained on the sale of LVT, there would clearly be no need to store excess LVT in inventory – as it would all be shipped to purchasers.

300.   Defendants knew of, or recklessly disregarded, these inventory reports showing excess (defective) LVT stored in inventory, which obviously contradicted their public statements.

301.   Despite the Company documenting in weekly reports the massive amounts of excess carpet and LVT stored in inventory, Mohawk continued to produce more carpet and LVT to manipulate Mohawk's reported margins and pump up its balance sheet. As CW9 put it, this was done intentionally to make up for weak sales.

**L.    Mohawk's Admissions of Material Weaknesses in Internal Controls and Financial Reporting in 2015 Required Defendants to Monitor Inventory Accounting Personally**

302.   According to numerous former employees of Mohawk, the Company stored as inventory massive amounts of defective and unsellable LVT and carpet, for which there was no customer demand.

303.   As set forth herein at ¶¶ 175-176, Mohawk and the Individual Defendants were obligated to monitor the Company's inventory. Prior to the relevant period, on November 10, 2016, the Company admitted it had been caught by the Public Company Accounting Oversight Board not implementing proper internal controls "related to documenting management's inventory control oversight." And, to address this, Mohawk had created "policies that require specific monitoring" of its inventory levels by senior management.

304.   Accordingly, in light of Mohawk's inventory monitoring problems prior to the relevant period, and the purported remedies Mohawk implemented to address the inventory monitoring problem, it would be unreasonable to infer Mohawk's inventories grew during the relevant period (as former employees assert), while Defendants remained ignorant of the problem.

## M.   Mohawk Adopted *and Studied* the Impact of New Accounting Provisions Concerning Revenue Recognition and Inventory During the Relevant Period

305.   Prior to, and during the relevant period, GAAP rules concerning the revenue of recognition underwent changes. Mohawk, in its public SEC filings signed by Defendants Lorberbaum and Boykin, and reviewed by Defendant Carson, discussed the significance of these accounting changes and specifically assured

investors the Company had studied the new rules and the Company had recognized revenue properly. *See* ¶¶ 105-107, 194, 206, 224.

306.   Absent intent to deceive, no reasonable study of the Company's sales practices, particularly Mohawk's efforts to pull in future sales and the Saturday scheme, could possibly reach the conclusion the Company had properly recognized revenue in the 2017-2018 period.

### N.   Mohawk Tracked Channel Stuffing and the Saturday Scheme in Reports Provided to Mohawk's Senior Executives

307.   According to CW12, among others, Mohawk's C-level senior executives (including CEO Lorberbaum and CFO Boykin) received regular reports of sales activities showing spikes in sales on the last day of each quarter. These reports evidenced Mohawk's efforts to ship product at the end of a quarter to meet financial targets, and showed a "huge spike" in sales.

### O.   Mohawk's Quarterly Sales Push was Driven Top-Down

308.   Mohawk's entire North American Flooring Segment perpetrated an end-of-quarter sales push to pull in future orders to meet earnings expectations. As CW6 (among others, including CW10) confirmed, this was a nationwide effort to "drain the swamp."

309.   This practice was not the result of a few low-level employees acting in isolation or covertly. Rather, low-level employees across the country were told to do this by upper-management. As detailed by CW5, the shipment of product to manipulate earnings was openly discussed in weekly staff meetings attended by Defendant Carson, the head of the North American Flooring Segment.

## P.   Defendant Carson's Departure

310.   Mohawk effectively fired Defendant Carson in November 2018, shortly after the Company's stock price plunged July 26, 2018, when Mohawk was forced to reveal the true financial condition of the Company was not what had been previously represented to investors.

311.   Mohawk issued a public press release announcing that "Brian Carson, former president of the Company's Flooring North America segment, will leave the Company on November 12, 2018 to pursue other interests."

312.   Mohawk's announcements of executive departures typically thanked the executive for his/her time at the Company. The fact that Mohawk did not thank Carson, and the timing of Carson's departure, support a strong inference that Mohawk fired Carson for cause and as a result of Carson's role in the fraudulent scheme alleged herein.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

313.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions. To the extent that any of the statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements. Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer of Mohawk who knew that the statement was false when made. Further, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events,

and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## XI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Against Mohawk, Lorberbaum, Boykin, and Carson for Violations of §10(b) of the Exchange Act and SEC Rule 10b-5**

314.  Plaintiffs incorporate by reference ¶¶ 1-313, as if fully set forth herein.

315.  Defendants along with other Mohawk employees, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Mohawk, as specified herein.

316.  Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for Mohawk common stock in violation of §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

317.   Defendants: (i) deceived the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflated and maintained the market price of Mohawk's common stock; and (iii) caused Plaintiffs to purchase Mohawk shares at artificially inflated prices.

318.   The Individual Defendants' primary liability, and controlling person liability, arise from the following facts: (i) each was a high-level executive and/or director at the Company; (ii) each, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iii) each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading.

319.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Mohawk's publicly disseminated information. The Individual Defendants were provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions

and access to material non-public information available to them, the Individual Defendants knew that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

320.   Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein, or acted with reckless disregard for the truth by failing to ascertain and disclose such facts, even though such facts were available. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Mohawk's adverse operating condition and financial condition, including its efforts to manipulate reported financial results by pulling in sales from future quarters, conceal problems with manufacturing of LVT, refusal to write down excess inventory, and over-production of carpet and LVT to drive down COGS, from the investing public and supporting the artificially inflated price of its securities. As alleged herein, Defendants had actual knowledge of the misrepresentations and omissions alleged, or were reckless in failing to obtain such knowledge by deliberately refraining from discovering whether their statements were false or misleading.

321.   As a result of the fraudulent activities of Defendants described above, the market price of Mohawk common stock was artificially inflated. In ignorance of the fact that the market price of Mohawk common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Mohawk common stock traded at the time when such statements were made, Plaintiffs acquired Mohawk common at artificially high prices and were damaged thereby, as evidenced by, among other factors, the stock price declines identified herein that released the artificial inflation from Mohawk common stock. At the time of the alleged misrepresentations and omissions, Plaintiffs were unaware of their falsity, and believed the false statements to be true. Had Plaintiffs known the true nature of the operations of Mohawk and of the Company's failure to disclose it true financial condition, Plaintiffs would not have purchased or otherwise acquired Mohawk common stock.

322.   Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine for publicly traded Mohawk common stock. At all times relevant to this Complaint, the market for Mohawk common stock was an efficient market. Mohawk common stock was listed and actively traded on a highly

efficient and automated market; Mohawk filed periodic public reports with the SEC; Mohawk was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company; and, Mohawk regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace. As a result, the market for Mohawk equity securities promptly digested current information regarding Mohawk from all publicly available sources and reflected such information in Mohawk's stock price.

323.   Plaintiffs can also establish actual reliance. Plaintiffs actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein, and as detailed in § VI.

324.   Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose to investors material facts known to the Defendants concerning Mohawk's efforts to manipulate reported financial results by pulling in sales from future quarters, conceal problems with manufacturing of LVT, refusal to write down excess inventory, and over-production of carpet and LVT to drive down COGS.

325. The market prices for Mohawk common stock declined materially upon the various public disclosures of the Company's true financial condition and the true facts that had been misrepresented or concealed as alleged herein.

326. As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of Mohawk common stock.

327. By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## SECOND CAUSE OF ACTION

### Against Mohawk, Lorberbaum, Boykin, and Carson for Violations of §18 of the Exchange Act

328. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

329. This claim is asserted against Defendants for violations of §18 of the Exchange Act.

330.   As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Mohawk, including the Company's filings on Forms 8-K, 10-K and 10-Q during the relevant period. Specifically, Plaintiffs read and relied on the Company's financial statements, the Company's disclosures concerning its internal controls, financial reporting and statements regarding Mohawk's sales of LVT, inventory and inventory valuations, LVT production, and the cause of the Company's increasing revenue and earnings, as identified in § VII.

331.   Plaintiffs read and relied upon statements in the Company's SEC filings concerning Mohawk's financial statements being materially complete and not omitting material information. Plaintiffs read and relied upon disclosures that Defendants purportedly implemented appropriate internal controls over accounting and utilized independent committees to oversee business governance and compensation. Plaintiffs read and relied upon Defendants' signed SOX Certifications. Plaintiffs and/or their agents relied on these SEC filings not knowing that they were false and misleading.

332.   The reliance by Plaintiffs and/or their agents was reasonable.

333.   When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of Mohawk common stock.

334.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their purchases of Mohawk common stock.

335.   Plaintiffs have brought this action within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

336.   By virtue of the foregoing, Defendants violated §18 of the Exchange Act.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Violations of §20(a) of the Exchange Act

337.   Plaintiffs incorporate by reference ¶¶ 1-336, as if fully set forth herein.

338.   During the relevant period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Mohawk's business affairs. Because of the

Individual Defendants' senior positions, they knew the adverse non-public information about Mohawk's efforts to manipulate reported financial results by pulling in sales from future quarters, conceal problems with manufacturing of LVT, refusal to write down excess inventory, and over-production of carpet and LVT to drive down COGS.

339.   As officers of a publicly owned company, the Individual Defendants had a duty to disseminate complete, accurate and truthful information with respect to Mohawk's financial condition and results of operations, and to correct promptly any public statements issued by Mohawk which had become materially false or misleading.

340.   Because of the Individual Defendants' positions of control and authority as senior officers of Mohawk, they were able to, and did, control the contents of the various reports, press releases and public filings which Mohawk disseminated in the marketplace during the relevant period. Throughout the relevant period, the Individual Defendants exercised power and authority to cause Mohawk to engage in the wrongful acts complained herein. The Individual Defendants, therefore, were each a "controlling person" of Mohawk within the meaning of §20(a) of the Exchange Act. In this capacity, the Individual Defendants participated

in the unlawful conduct alleged which artificially inflated the market price of Mohawk common stock.

341.   By reason of the above conduct, the Individual Defendants are each jointly and severally liable pursuant to §20(a) of the Exchange Act for Mohawk's primary violations of the Exchange Act as alleged herein.

## FOURTH CAUSE OF ACTION

### Against All Defendants for Common Law Fraud

342.   Plaintiffs incorporate by reference ¶¶ 1-336, as if fully set forth herein. This claim is asserted against all Defendants based on common law principles of fraud and conspiracy.

343.   Defendants made, authorized or caused to be made numerous false representations of material fact to induce Plaintiffs to purchase Mohawk's common stock.

344.   Defendants made numerous material misrepresentations or omitted facts about Mohawk's end-of-quarter sales, by which Mohawk brought forward sales at the end of each financial quarter to manipulate the timing of its sales and give the appearance that such sales took place in the respective quarters when the

revenue was improperly recognized in violation of generally accepted accounting principles and Mohawk's own policies.

345.   In addition, Defendants made numerous material misrepresentations or omitted facts about the quality of Mohawk's LVT production, including by fraudulently representing that Mohawk's sales of LVT were limited only by their capacity constraints and covering up the fact that its US-based LVT production was defective.

346.   Defendants also covered up and failed to disclose the fact that the large sums of waste was placed into Mohawk's inventory rather than written off and properly disposed of, thus having the effect of bloating Mohawk's inventory while artificially improving its profit margins by reducing the unit costs of manufacturing and thereby appearing to inflate its profits.

347.   Defendants also made numerous material misrepresentations or omitted material facts about its inventory levels and profit margins by failing to disclose that Mohawk was directing production overruns of excess product, which had the intended effect of appearing to drive down the costs to manufacture each product by spreading the Company's fixed manufacturing costs across more products.

348.   Defendants' schemes were intended to, and did, have the desired effect of helping Mohawk meet analysts' financial projections and avoid an earnings miss that would cause Mohawk's stock price to decline.

349.   Defendants knew that these statements were false when made or omitted material facts, or at the very least, they made the statements with reckless disregard for their truth. Each of the Defendants was perpetrating a fraud on Maverick and the market, causing Mohawk's stock to trade at an artificially inflated price.

350.   Defendants knew that Maverick and other investors would receive and rely on such representations, and intended that their false and/or misleading statements would induce Maverick to purchase Mohawk's common stock at inflated prices.

351.   Defendants' misrepresentations were material because they concerned critical and highly scrutinized information regarding Mohawk's operating performance, the accuracy of its reported financial information, and its sales and margins metrics in particular, and its internal controls over financial reporting as well as its disclosures controls and procedures. Defendants' statements were also material because they were important to the quality of management, the integrity of

the Company's senior managers, the adequacy and effectiveness of financial controls, and the overall financial performance of the Company.

352.   Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Maverick would not have purchased Mohawk's common stock at all, or at the prices Maverick paid, had Maverick known the true facts regarding Defendants' various schemes.

353.   As a direct and proximate result of such reliance, and Defendants' fraudulent statements and omissions of material fact and unlawful misconduct, Plaintiffs have suffered damages, in an amount to be proven at trial.

354.   In committing fraud, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorney's fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Against All Defendants for Negligent Misrepresentation

355.   Plaintiffs incorporate by reference ¶¶ 1-313, as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or with extreme reckless disregard for the truth. For the

purposes of this claim, Plaintiffs asserts only negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

356.   By reason of the conduct described herein, Defendants negligently made misrepresentations and/or concealed or failed to disclose material facts about Mohawk's financial performance and business operations, its reported financial information, and internal controls and corporate governance. These false and misleading statements were made by virtue of Defendants' public statements and SEC filings that purported to provide an accurate and honest reporting of Mohawk's business operations and financial condition.

357.   In making each of the misstatements set forth herein, Defendants failed to act with the prudence required of a reasonable person in each of their respective positions, and each was otherwise careless and/or reckless in making material statements of fact to Plaintiffs to induce its investment of hundreds of millions of dollars in Mohawk stock.

358.   Each of Defendants had a duty of care to, and special relationship with, Plaintiffs.

359.   Each Defendant personally induced Plaintiffs' investment in Mohawk by leveraging their senior management positions and their unique knowledge of

Mohawk's finances and business operations, due to their access to inside Company information. Each Defendant developed a special degree of trust with Plaintiffs in making their investment decision regarding the purchase of Mohawk's stock.

360.   Plaintiffs actually read, reviewed and relied on, and were misled by, Defendants' misrepresentations. Plaintiffs' reliance was reasonable and justifiable under the circumstances, because Plaintiffs were outside investors in Mohawk and without access to nonpublic information and Plaintiffs had no reason to doubt that Defendants were being truthful and forthcoming in making their representations to them.

361.   As a proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have been harmed in an amount to be proven at trial.

362.   In committing negligent misrepresentation, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Against All Defendants for Violations of the Georgia Uniform Securities Act of 2008: Section 110-5-50 *et seq*.

363.   Plaintiffs incorporate by reference ¶¶ 1-313, as if fully set forth herein.

364.   Pursuant to O.C.G.A. § 10-5-50, it is unlawful for a person, in connection with the offer, sale or purchase of a security, directly or indirectly: (1) To employ a device, scheme, or artifice to defraud; or (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

365.   By their purchase of Mohawk common stock, Plaintiffs purchased a security as defined by O.C.G.A. § 10-5-2(31).

366.   As detailed above, Defendants made numerous misrepresentations to Plaintiffs, including false and misleading statements and omissions concerning Mohawk's end-of-quarter sales to meet financial projections, defective LVT produced by the U.S. LVT Plant, and the deliberate production overruns that Mohawk undertook. Defendants perpetrated these schemes to falsify Mohawk's publicly reported financial results to meet analyst expectations and avoid an earnings miss.

367.   Defendants made untrue statements of material fact and omitted to state material facts regarding these schemes. Moreover, because they deployed but

failed to disclose these abusive and deceptive practices, Defendants made numerous material misrepresentations or omitted facts about the accuracy and effectiveness of Mohawk's internal controls over financial reporting and corporate governance, as well as Mohawk's disclosure controls and procedures.

368.   By their misrepresentations and their fraud and deceit, Defendants engaged in a device, scheme or artifice to fraud, as well as committed acts, engaged in practices and a course of business which is fraudulent, deceptive or manipulative. Defendants' statements were made with scienter in that they were made knowing they were not true – and with respect to omissions, Defendants knew that they omitted material facts – or at the very least, they made the statements with severely reckless disregard for their truth. Defendants intended to defraud Plaintiffs by their false statements.

369.   Plaintiffs relied on the Defendants' misrepresentations and omissions, and Plaintiffs' reliance was justifiable and reasonable.

370.   As a direct and proximate result of Defendants' violations of the Georgia Uniform Securities Act, Plaintiffs have suffered economic loss and other damages in an amount to be proven at trial.

371.   In their violations of the Georgia Uniform Securities Act, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Against All Defendants for Violations of Georgia RICO, O.C.G.A. Sections 16-14-4(a) and 16-14-4(b)

372.   Plaintiffs incorporate by reference ¶¶ 1-371, as if fully set forth herein.

373.   Defendants are each "persons" within the meaning of O.C.G.A. § 16-14-4.

374.   Defendant Mohawk is an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affects commerce in the State of Georgia and elsewhere.

375.   Alternatively, Lorberbaum, Boykin, and Carson, who operated as an "association in fact," comprise an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affects commerce in the State of Georgia and elsewhere. Such "association in fact" is an ongoing organization organized for the purpose of perpetrating an illegal scheme to defraud Plaintiffs. Such an enterprise is controlled by Lorberbaum, Boykin and Carson and regularly carries out its function of perpetrating the fraudulent and illegal schemes of Lorberbaum, Boykin, and

Carson. The enterprise existed at all relevant times and still exists. Lorberbaum, Boykin, and Carson are persons who, through a pattern of racketeering activity, acquired and maintained, directly or indirectly, an interest in or control of personal property including monies paid by Plaintiffs for their investments in Mohawk. Such pattern of racketeering activity included at least two acts of "racketeering activity," including mail and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. §1961(1).

376.   Mohawk has conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise described in this Complaint through at least two acts of "racketeering activity," including mail and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. § 1961(1).

377.   Defendants knowingly, intentionally, and willfully acquired or maintained an interest in funds belonging to Maverick, including monies paid by Plaintiffs for their investments in Mohawk, through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs. Defendants' enterprise existed for the sole improper purpose of furthering a scheme to defraud, steal, and wrongfully and unlawfully acquire the assets of Plaintiffs and others, and

the enterprise continues to carry on efforts to conceal its prior activities against Plaintiffs.

378.   Indeed, from at least 2016 and continuing to the present in Georgia and elsewhere, by continuing to keep secret their fraudulent schemes. Defendants have violated (1) Ga. Code §16-14-4(a), through a pattern of racketeering activity, to acquire or maintain, directly or indirectly an interest in, or control of Plaintiffs' personal property, including the monies used to invest in Mohawk common stock; and (2) Ga. Code § 16-14-4(b), by being employed by or associated with an enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

## Multiple Instances of Mail Fraud and Wire Fraud

379.   Defendants intentionally and willingly devised and participated in a scheme to defraud Plaintiffs of funds, and knowingly and intentionally engaged in a racketeering act by using the interstate mails, in violation of 18 U.S.C. § 1341, and interstate wires, in violation of 18 U.S.C. § 1343, as integral and essential devices to advance, further, and facilitate that scheme.

380.   The discrete acts of racketeering activity of Defendants constitute a pattern of racketeering activity in that they have committed at least two acts of

racketeering activity that had the same or similar purposes, results, participants, victims, or methods of commission. The discrete acts of racketeering activity of Lorberbaum, Boykin, and Carson with respect to Mohawk also evidence or demonstrate that they are engaged in a pattern of racketeering activity.

381.   Because Defendants unlawfully acquired money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a), and because Defendants conducted and/or participated in the affairs of an enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b), and because Maverick was directly injured by the unlawful conduct of Defendants, the Plaintiffs are entitled to three times the amount of their actual damages, plus attorney's fees, costs, and investigative expenses, plus punitive damages in an amount sufficient to deter Defendants from engaging in similar conduct in the future.

382.   As a direct and proximate result of the racketeering activity of Defendants, Plaintiffs have suffered injury to their business and property. For example, and without limitation, Defendants used interstate wires to circulate materially false and misleading information regarding Mohawk's financial performance and business operations to Plaintiffs, which were purposefully misleading and which Plaintiffs justifiably relied on to their detriment

383.   These acts caused Defendants to acquire and maintain an interest in funds belonging to Plaintiffs, including monies paid by Plaintiffs for their investments in Mohawk.

## Theft by Taking and Theft by Deception

384.   Upon information and belief, Defendants engaged in the racketeering act of theft by taking and theft by deception within the meaning of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3. In particular, as described elsewhere herein, Defendants unlawfully took and misappropriated certain funds and other property belonging to Maverick, including monies paid by Plaintiffs for their investments in Mohawk, with the intention of depriving Maverick of the same. Such taking of property constitutes the crime of theft by taking and theft by deception in violation of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3 and is an act of racketeering activity within the meaning of O.C.G.A. § 16-14-3(9)(A)(ix).

## Fraud under Georgia Uniform Securities Act of 2008

385.   By their acts and omissions alleged herein, and upon information and belief other acts and omissions, Defendants have committed fraud in connection with an offer, sale and/or purchase of securities to Plaintiffs in violation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 et seq., as amended,

by, among other things, (a) employing one or more device, scheme, or artifice to defraud; (b) making untrue statements of material facts or failing to state material facts necessary to make the statements made, in the light of the circumstances under which made, not misleading; or (c) engaging in an act, practice or course of business that operates as a fraud or deceit upon another person.

386.   Each act and omission of Defendants in committing securities fraud in violation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 *et seq*., as alleged herein, is an act of racketeering activity within the meaning of O.C.G.A. § 16-14-3(9)(A)(xxi), and collectively said acts and omissions constitute a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8).

387.   As alleged herein, Defendants committed no less than two acts of racketeering activity as defined in O.C.G.A. § 16-14-3(9) in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics, said acts occurring within four (4) years of one another and not being isolated incidents.

388.   The foregoing acts of mail fraud and wire fraud, of theft by taking and theft by deception, and of fraud under the Georgia Uniform Securities Act of 2008

constitute a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8), are not isolated incidents, and were all undertaken in furtherance of schemes that are interrelated in that, *inter alia*: (a) they had the similar purposes of improperly defrauding Maverick out of millions of dollars; (b) they had similar participants, *i.e.*, Defendants Mohawk, Lorberbaum, Boykin, and Carson; and (c) they had similar methods of commission and results.

389.   The foregoing racketeering acts also illustrate continuity and the threat of continuity, moreover, in that they have come to reflect Defendants' regular way of doing business and Defendants used the misappropriated funds in connection with their ongoing ventures.

390.   Defendants, acting in concert with one another and others, have engaged in a pattern of racketeering activity as defined in O.C.G.A. § 16-14-3(8) and acquired personal property, including money, belonging to Plaintiffs in violation of O.C.G.A. § 16-14-4(a) and (b).

391.   By direct and proximate reason of Defendants' pattern of racketeering activity and the predicate acts it comprises, and as a result of Defendants' violations of O.C.G.A. § 16-14-4, Plaintiffs have suffered actual, consequential and other damages to their business and property in an amount to be proven at trial.

392.   Plaintiffs have been injured in their business and property by reason of Defendants racketeering activities in violation of Ga. Code § 16-14-4(a) and (b). Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages equal to three times the amount of actual damages sustained by Plaintiffs, punitive damages in an amount to be determined at trial by the enlightened conscience of the jury, and attorneys' fees and costs of investigation and litigation reasonably incurred by Plaintiffs in this action.

393.   In violating the Georgia RICO statute, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Against All Defendants for Violations of Georgia RICO Conspiracy, O.C.G.A. Section 16-14-4(c)

394.   Plaintiffs incorporate by reference ¶¶ 1-393, as if fully set forth herein.

395.   Defendants Mohawk, Lorberbaum, Boykin and Carson, in combination with one or more other persons identified herein, agreed and conspired to violate O.C.G.A. § 16-14-4(a) and (b).

396.   In particular, Defendants agreed with each other and with such persons to acquire or maintain an interest in or control of Plaintiffs' purchase of Mohawk

common stock as well as conduct and participate in the conduct of the affairs of

Mohawk, through a pattern of racketeering activity, including wire and mail fraud

in violation of 18 U.S.C. § 1341 and 18 U.S.C § 1343, theft by taking as well as

theft by deception, in violation of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3, and

fraud in connection with an offer, sale and/or purchase of securities to Plaintiffs in

violation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 et seq.,

as amended.

397.   Defendants and the persons with whom they conspired knew that their

predicate acts were part of a pattern of racketeering activity and agreed to the

commission of those acts to further the schemes described above. That conduct

constitutes a conspiracy to violate O.C.G.A. § 16-14-4(a) and (b) in violation of

O.C.G.A. § 16-14-4(c).

398.   Defendants were an enterprise as that term is defined in Ga. Code §

16-4-3(6); that is, a group of individuals and legal entities, foreign and domestic,

associated in fact for the common purpose of fraudulently acquiring the assets of

Plaintiffs. The enterprise existed at all relevant times and still exists.

399.   The enterprise existed and exists (to the extent that Defendants have

continued to keep their fraudulent schemes a secret) for the sole improper purpose

of furthering a scheme to defraud, steal, and wrongfully and unlawfully acquire the assets of Plaintiffs, and the enterprise continues to carry on efforts to conceal its prior activities against Plaintiffs.

400.   Indeed, from at least 2016 and continuing to the present (by continuing to keep their fraudulent schemes), Defendants unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with each other and with other persons to violate (1) Ga. Code § 16-14-4(a), through a pattern of racketeering activity, to acquire or maintain, directly or indirectly, an interest in, or control of Plaintiffs' personal property, including the monies it invested in Mohawk common stock; and (2) Ga. Code § 16-14-4(b), by being employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

401.   The improper purpose and common objective of the conspiracy was to acquire for Defendants the Plaintiffs' assets to use for Defendants' benefit and the benefit of others.

402.   At the inception and during the course of this conspiracy, Defendants and those employed by or associated with the enterprise, each personally agreed to the overall objective of the conspiracy or to commit two racketeering acts.

403.   The pattern of racketeering activity through which Defendants and their coconspirators agreed to conduct and participate in the conduct of the affairs of the enterprise in furtherance of their fraudulent scheme consisted, among other things, of multiple acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, theft by taking and theft by deception within the meaning of O.C.G.A. § 16-8-2 and O.C.G.A. § 16-8-3, and violations of the Georgia Uniform Securities Act of 2008, Ga. Code § 10-5-1 to 10-5-90.

404.   These activities took place in, among other places, Georgia and affected interstate and foreign commerce.

405.   Each coconspirator aided and abetted and rendered substantial assistance in the accomplishment of the scheme or artifice complained of herein. In taking the actions set forth above, each coconspirator acted deliberately and while aware that the conduct in question would substantially assist the accomplishment of violations of the law. Each coconspirator was aware of making a contribution to the conspiracy, common enterprise, and the common course of conduct complained of above.

406.    Each coconspirator participated in, aided and abetted, and conspired to accomplish the illegal conduct herein alleged in order to obtain Plaintiffs' assets and to enrich the enterprise and its members at the expense of Plaintiffs.

407.    As a direct and proximate result of said conspiracy, the overt acts taken in furtherance thereof, and the violations of O.C.G.A. § 16-14-4(c), Plaintiffs have been injured in its business and property by reason of the conspiracy in an amount to be proven at trial.

408.    In their conspiracy to violate RICO, Defendants have acted in bad faith and are thereby liable for Plaintiffs' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### Against All Defendants for Punitive Damages

409.    Plaintiffs repeat and reallege the foregoing allegations as if set forth fully herein.

410.    At times regarding the actions of Defendants complained of in this action, there is clear and convincing evidence that defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of

care which would raise the presumption of conscious indifference to consequences, in violation of O.C.G.A. § 51-12-5.1(b).

411.   Punitive damages should be awarded to Plaintiffs to punish and penalize Defendants, jointly and severally, for their actions that have harmed Plaintiffs, and to deter Defendants from ever again committing such actions, in an amount to be determined by a jury at trial. O.C.G.A. § 51-12-5.1(c).

412.   At all times, Defendants have acted with specific intent to harm Plaintiffs, such that an award of punitive damages by a jury at trial shall not be limited in amount. O.C.G.A. § 51-12-5.1(f).

## TENTH CAUSE OF ACTION

### Against All Defendants for Attorneys' Fees and Expenses Under O.C.G.A. § 13-6-11

413.   Plaintiffs repeat and reallege the foregoing allegations as if set forth fully herein.

414.   Defendants have caused Plaintiffs unnecessary trouble and expense in their attempt to recover amounts due to them. As such, Plaintiffs are entitled to attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11, and other applicable law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein.

B.      Requiring Defendants to pay punitive damages for their violations of common law fraud and by reason of the acts and transactions alleged herein.

C.      Awarding Plaintiffs prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law, as well as Plaintiffs' reasonable attorneys' fees, expert fees and other costs.

D.      Awarding such other and further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  June 22, 2021          Respectfully submitted,

HENNER & SCARBROUGH LLP

/s/ *Tyler P. Scarbrough*
KAREN E. BAIN
Georgia Bar No. 495153
kbain@henscarlaw.com
TYLER P. SCARBROUGH
Georgia Bar No. 401055
tscarbrough@henscarlaw.com
3379 Peachtree Road NE, Suite 555
Atlanta, Georgia 30326
Telephone: (404) 260-3206
Facsimile: (404) 260-3205


DIETRICH SIBEN THORPE LLP
MATTHEW P. SIBEN (*pro hac vice pending)*
500 Australian Avenue South, Suite 637
West Palm Beach, FL 33401
Telephone: (561) 820-4882
Facsimile: (561) 820-4883
matthew@dstlegal.com

– and –

DAVID A. THORPE (*pro hac vice pending*)
SHAWN M. HAYS (*pro hac vice pending*)
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8450
Facsimile: (310) 300-8401
david@dstlegal.com


Attorneys for Plaintiffs Maverick Fund, Ltd., Maverick USA, L.P., Maverick Fund II, Ltd., Maverick Long Fund, Ltd., Maverick Long Enhanced Fund, Ltd. and Sprugos Investments IX, L.L.C.

## **Local Rule 7.1D Certification**

Counsel for Plaintiffs hereby certifies that the text of this document has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1C.

HENNER & SCARBROUGH LLP

*/s/ Tyler P. Scarbrough*
KAREN E. BAIN
Georgia Bar No. 495153
kbain@henscarlaw.com
TYLER P. SCARBROUGH
Georgia Bar No. 401055
tscarbrough@henscarlaw.com
3379 Peachtree Road NE, Suite 555
Atlanta, Georgia 30326
Telephone: (404) 260-3206
Facsimile: (404) 260-3205